**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

JAMSPORTS AND                )
ENTERTAINMENT, LLC,          )
                         )
    *Plaintiff,*  )
                         )
    v.             )
                         )
AMERICAN MOTORCYCLIST         )
ASSOCIATION                  )
                         )
    *Defendant.*   )



## COMPLAINT

Plaintiff JamSports and Entertainment, LLC ("JamSports") states the following for its complaint against Defendant American Motorcyclist Association ("AMA"):

### I. SUMMARY OF ACTION

1.    This is an action brought by JamSports for damages resulting from (i) the AMA's wrongful interference with JamSports' contractual rights, (ii) the AMA's wrongful interference with JamSports' prospective business opportunities and/or (iii) the AMA's breach of contract it entered into with JamSports through its wholly owned and for-profit subsidiary, Paradama Productions Inc. d/b/a AMA Pro Racing ("AMA Pro Racing")

2.    In early November 2001, AMA Pro Racing named JamSports the promoter of the AMA Supercross racing series for the 2003-2009 racing seasons. Contemporaneous therewith, AMA Pro Racing and JamSports entered into a written promotion agreement (the "First Agreement") reflecting the material terms of the parties' agreed-to relationship, plus an obligation to negotiate confidentially, exclusively, and in

good faith toward a final promotion agreement. Thereafter, JamSports proceeded to perform in accordance with the First Agreement and the parties negotiated the terms of a second, more definitive, promotion agreement (the "Promotion Agreement"). By early February, 2002, the parties finalized the Promotion Agreement, and it was approved by AMA Pro Racing's board of directors. However, AMA Pro Racing ultimately refused to provide JamSports with a signed Promotion Agreement and subsequently reneged upon the Promotion Agreement.

3.     The AMA, amongst others, is directly responsible for these breaches. The AMA disapproved of AMA Pro Racing entering into these contracts with JamSports because it preferred that AMA Pro Racing maintain its relationship with SFX Motor Sports, Inc. d/b/a Clear Channel Entertainment -- Motor Sports ("Clear Channel"), the company that had promoted the AMA Supercross series prior to the selection of JamSports as promoter. Because it desired to remain with Clear Channel, and despite the fact that JamSports met all of its obligations under the First Agreement and that AMA Pro Racing and JamSports successfully negotiated and approved a Promotion Agreement, the AMA renounced the JamSports contracts and directed AMA Pro Racing not to sign the Promotion Agreement.

4.     In addition to directly ordering AMA Pro Racing to breach its contracts with JamSports, members of the AMA's Board of Directors, who had knowledge of JamSports' contractual rights, engaged in a pattern of conduct, including numerous conversations with Clear Channel and AMA Pro Racing representatives via telephone, in person and in writing in an attempt to stop AMA Pro Racing from meeting its obligations

under the First Agreement and to prevent AMA Pro Racing from signing and performing under the Promotion Agreement it entered into with JamSports.

5.     As a direct and proximate result of the AMA's tortious efforts, in March 2002, AMA Pro Racing gave Clear Channel the very rights to promote the AMA Supercross racing series that had been contractually promised to JamSports.

6.     Alternatively, the AMA is liable for the breach of the First Agreement and Promotion Agreement because AMA Pro Racing was the AMA's alter ego and not a truly independent company as evidenced by AMA Pro Racing's and the AMA's own assertion that the AMA retained control of the contractual rights in question.

7.     As a result, JamSports has sustained economic injuries in excess of $20 million.

## II. JURISDICTION AND VENUE

8.     JamSports, incorporated in Delaware, has its principal place of business in Chicago, Illinois. The AMA, registered in Ohio, also has its principal place of business in Ohio. The amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs. Because there is diversity of citizenship between the parties to this action and the amount in controversy exceeds $75,000.00, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(c)(1).

9.     For purposes of venue, substantial parts of the events giving rise to JamSports' claims against the AMA occurred in this judicial district. The First Agreement and the Promotion Agreement were negotiated, in part, in this judicial district. Communications between the AMA Pro, the AMA and JamSports and other actions in furtherance of the contract occurred in Chicago, Illinois. In addition, the AMA transacts

3

business and is found in this judicial district. Accordingly, venue is proper here pursuant to 28 U.S.C. § 1391(b).

### III. THE PARTIES

10. JamSports is a Delaware limited liability company, having its principal place of business in Chicago, Illinois. JamSports is engaged in the business of, among other things, producing and promoting sporting events.

11. On information and belief, the AMA is registered in Ohio and has its principal place of business in Pickerington, Ohio. The AMA is a 265,000 member not-for-profit organization that holds itself out as an organization engaged in protecting and promoting the interests of motorcyclists. According to its website, the AMA is the world's largest motorsports sanctioning body. Its subsidiary, AMA Pro Racing, is or has been engaged in, among other things, the business of sanctioning, scheduling, producing and promoting motorcycle sporting events, and negotiating to do the foregoing, in Illinois and throughout the United States. At all times relevant hereto, the AMA and AMA Pro Racing were present and have transacted business in Illinois.

### IV. ALLEGATIONS COMMON TO ALL COUNTS

12. AMA Pro Racing, a division of the AMA, represents and holds itself out as being the owner of, and sanctioning body for, the AMA Supercross Series, which is a championship-level, dirt-track motorcycle racing series held in large indoor and outdoor stadiums around the U.S. each year from January through May. The AMA Supercross Series is an extremely valuable franchise. The series generates approximately $25 million in annual revenues, including gate receipts, ancillary revenues, sponsorships and television rights.

4

13.     From 1997 through 2002, the AMA Supercross Series was promoted by Clear Channel (or by companies that Clear Channel subsequently acquired). However, Clear Channel's contract to promote the AMA Supercross Series was to expire at the conclusion of the 2002 racing season.

14.     Beginning in the Summer of 2001, AMA Pro Racing solicited bids from other promoters, including JamSports, for the purpose of entering into an agreement to promote the AMA Supercross Series in 2003 and beyond.

### The First AMA Pro Racing Agreement With JamSports

15.     On November 2, 2001, AMA Pro Racing and JamSports entered into an agreement under which JamSports agreed to produce and promote the AMA Supercross Series, and undertake related sales and marketing matters (the "First Agreement"). A true and correct copy of the First Agreement is attached as Exhibit A.

16.     Pursuant to Paragraph 1 of the First Agreement, AMA Pro Racing and JamSports agreed to produce and promote not less than fourteen (14) AMA Supercross Series events per season (defined as January 1 through the first week of May) for a period of seven (7) years beginning January 1, 2003, with an opportunity to extend the term.

17.     AMA Pro Racing and JamSports also agreed that, except for the Daytona event, JamSports would have the exclusive rights to produce and promote the AMA Pro Racing Supercross Series in North America.

18.     In addition, the First Agreement sets forth the parties' understanding with respect to financial terms. Pursuant to Paragraph 7(a), AMA Pro Racing and JamSports agreed that AMA Pro Racing would receive the greater of eight percent (8%) of the gross

5

gate receipts or thirty percent (30%) of the net income from each Supercross event. Paragraph 7(a) of the First Agreement states, in part:

> **Event Revenue Share.** AMA Pro Racing shall receive the greater of (i) eight percent (8%) of the gross gate receipts (less applicable taxes and facility fees) of each Supercross event, or (b) thirty percent (30%) of Net Income of each Supercross event (in either case, hereinafter referred to as "Revenue Share"), and the remainder of the gross gate receipts or Net Income, as the case may be, of each Supercross event, shall be retained by JamSports....

19.     The First Agreement also contained terms concerning "Other Revenue Streams." In Paragraph 8, the parties agreed to terms concerning "Series Media and Marketing Rights," "Event Sponsorship," "Product Merchandising Revenue," and Internet Merchandising and Audio Visual Products and Other Products." Those terms contemplate, *inter alia*, shared revenue between JamSports and AMA Pro Racing resulting from the business relationship.

20.     Pursuant to Paragraph 7(b), JamSports agreed to advance to AMA Pro Racing a non-refundable amount of three million dollars ($3,000,000.00). Paragraph 7(b) states:

> **Advance.**
>     (i)     **Timing. Purpose. Amount.** JamSports shall advance to AMA Pro Racing on a mutually agreed upon date (but not before the second calendar quarter of the calendar year 2002) the non-refundable amount of Three Million Dollars ($3,000,000.00) (the "Advance"), which amount shall be used by AMA Pro Racing as general working capital to ensure the success of the Supercross series through the creation of a media and television series that attracts sponsorships.
>     (ii)     **Recoupment by JamSports.** JamSports is entitled to and shall recoup the Advance from AMA Pro Racing's Revenue Share. After JamSports recoups the Advance, JamSports shall commence paying AMA Pro Racing's Revenue Share To AMA Pro Racing.

21.     The First Agreement reflected the material terms of the agreed-to relationship with respect to JamSports' promotion of the AMA Supercross series from

2003 to 2009. The First Agreement is itself a binding agreement giving JamSports the right to promote the AMA Supercross series from 2003 to 2009.

22. The parties anticipated and agreed that they would reduce the terms and conditions that had been agreed upon in their First Agreement into other written agreements that, collectively, would be referred to as the Promotion Agreement (the "Promotion Agreement").

23. Having already negotiated and agreed to all of the material terms and conditions for the transaction that the parties had agreed to undertake, the parties agreed to use their best efforts and negotiate in good faith the final form of the Promotion Agreement, together with any remaining contractual terms and conditions that would be necessary to carry out the intent of the First Agreement. Paragraph 13 of the parties' First Agreement states:

> The parties shall use their best efforts, negotiating in good faith, to enter into the Promotion Agreement within thirty (30) days from the date this letter is fully executed by the parties hereto.

24. Having already negotiated and agreed to all of the material terms and conditions for the transaction that the parties had agreed to undertake, the parties further agreed that they would negotiate -- exclusively with each other -- the final form of the Promotion Agreement, together with any remaining customary contractual terms and conditions that would be appropriate for the transaction. Paragraph 13 of the First Agreement states:

> **Exclusivity.** Each of the parties agrees that for a period of ninety (90) days after the date this letter is fully executed by the parties hereto [], AMA Pro Racing and JamSports shall negotiate exclusively and in good faith with one another, and neither party shall enter into any discussions or negotiations with any third party with respect to the subject matter hereof.

25.     In furtherance of their agreement and commitment to negotiate in good faith and exclusively with each other, the parties also agreed to promptly notify each other if they received any other offers from other promoters seeking to promote and market AMA Supercross events. Paragraph 13 specifically provides:

> If a party hereto shall receive any offer from a third party with respect to the subject matter hereof, the receiving party shall promptly notify the other party hereto of the offer, the name of the offeror and the terms thereof.

26.     The parties also agreed to protect the confidentiality of the business relationship pending the anticipated execution of a formal Promotion Agreement. Paragraph 12 of the First Agreement states:

> **Confidentiality.** AMA Pro Racing and JamSports each agree that the terms of this letter agreement, and, in particular, its financial terms, are private and confidential. Neither party hereto shall divulge the terms of this letter of intent to any other persons in any manner, except each party may so inform its attorneys, accountants and financial consultants as reasonably necessary for the performance of its obligations hereunder and under the Promotion Agreement, who, however, shall be instructed not to divulge its terms to any other persons except and unless as they may be finally required by law or court process. In the event of a breach of the foregoing, the damaged party may seek recovery of all damages as allowed by law, including, without limitation, injunctive relief.

27.     Although the parties anticipated subsequently entering into the Promotion Agreement, the First Agreement explicitly provided that it, in and of itself, created a binding obligation on AMA Pro Racing to use its best efforts to negotiate the remaining terms of the deal in good faith, to deal exclusively with JamSports pending execution of a definitive promotion agreement, and to observe the confidentiality provisions contained in the First Agreement.

**JamSports' Performance Under the First Agreement
and in Reasonable Anticipation of the Promotion Agreement**

28.     On November 5, 2001, AMA Pro Racing's Chief Executive Officer, Scott Hollingsworth, sent a letter to numerous motor sports venues, announcing its partnership with JamSports and informing the venues that it had authorized JamSports to negotiate with the venues on an exclusive basis on AMA Pro Racing's behalf. A true and correct copy of AMA Pro Racing's November 5, 2001, letter is attached as Exhibit B.

29.     In a press release issued on November 6, 2001, AMA Pro Racing announced that it had selected JamSports as its new promoter partner for the AMA Supercross Series. It further announced that it made the decision after evaluating proposals from several companies, including Clear Channel, the promoter whose contract with AMA Pro Racing was scheduled to expire at the end of the 2002 season. A true and correct printed copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the announcement of a partnership with JamSports, is attached as Exhibit C.

30.     In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, JamSports immediately took steps to promote the AMA Supercross Series and to prepare for the 2003 season. As a result of JamSports' pre-existing relationship with Indianapolis Motor Speedway ("IMS"), it arranged a meeting between IMS and AMA Pro Racing, the result of which was an agreement to develop long-term plans for television production of AMA Supercross events. On December 3, 2001, AMA Pro Racing and JamSports issued a joint statement announcing AMA's alliance with IMS. A true and correct copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the IMS announcement, is attached as Exhibit D.

9

31. AMA Pro Racing issued another joint statement on December 7, 2001, announcing a television partnership with Speedvision, a 24-hour cable network devoted to motor sports. A true and correct copy of AMA Pro Racing's webpage as of February 27, 2002, devoted to the Speedvision announcement is attached as Exhibit E.

32. In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith, JamSports incurred substantial expenses and engaged in negotiations with marketing, radio, venues, merchandising, and sponsorship entities in an effort to promote the AMA Supercross Series and to prepare for the 2003 season.

33. On December 21, 2001, AMA Pro Racing and JamSports issued a joint statement announcing the list of major market cities for the 2003 racing season. A true and correct printed copy of AMA Pro Racing's webpage (as it existed on February 27, 2002), devoted to the racing schedule announcement, is attached as Exhibit F.

34. In reliance upon AMA Pro Racing's representations and its agreement to negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, JamSports also committed extensive resources to ensure that its infrastructure would be sufficient to support its partnership with AMA Pro Racing. For instance, in January, 2002, JamSports committed office space to AMA Pro Racing staff and AMA Pro Racing staff actually moved into JamSports' offices.

35. In reliance upon AMA Pro Racing's representations and its agreement to use its best efforts and negotiate exclusively and in good faith with JamSports, and with AMA Pro Racing's full knowledge and acquiescence, in November, 2001, JamSports

10

entered into a contract with Scoop Marketing, a public relations firm, for the sole purpose of promoting its relationship with AMA Pro Racing.

### The AMA Supercross Series Promotion Agreement

36.     Two days prior to the expiration of the exclusivity period, on or about January 30, 2002, AMA Pro Racing contacted JamSports and demanded certain modifications to the Promotion Agreement. It also informed JamSports that it would accept the form and content of the Promotion Agreement once those final modifications had been included in the Promotion Agreement.

37.     Thereafter JamSports prepared a revised draft of the parties' Promotion Agreement, incorporating all of AMA Pro Racing's requested modifications, for consideration by the parties. The revised draft of the Promotion Agreement was forwarded to AMA Pro Racing on February 1, 2002.

38.     Because AMA Pro Racing waited until the end of the exclusive negotiating period to demand these modifications, the parties by separate agreement dated February 1, 2002, extended the period to February 5, 2002. A true and correct copy of the February 1, 2002, letter is attached as Exhibit G. Even during the extension period, AMA Pro Racing delayed responding to JamSports and thus delayed concluding the transaction to which the parties had agreed, in breach of the terms of the First Agreement.

39.     On February 5, 2002, JamSports sent a letter to AMA Pro Racing confirming its acceptance of AMA Pro Racing's additional terms and notifying AMA Pro Racing that JamSports was ready, willing, and able to sign the Promotion Agreement. A true and correct copy of the February 5, 2002, letter is attached as Exhibit H.

40.     On February 8, 2002, JamSports sent a letter to AMA Pro Racing, again confirming its acceptance of all terms in the Promotion Agreement. True and correct copies of JamSports' January 8, 2002, acceptance letter and the Promotion Agreement are attached as Exhibits I and J respectively.

41.     Following JamSports' acceptance of AMA Pro Racing's modifications, there were no outstanding issues between the parties with respect to the Promotion Agreement.

42.     On or about February 14, 2002, AMA Pro Racing's Board of Directors approved the Promotion Agreement with JamSports.

43.     Despite the approval of the Promotion Agreement by AMA Pro Racing's board of directors on or about February 16, 2002 and despite the fact that, in Paragraph 20 of the Promotion Agreement, AMA Pro Racing warranted that it had authority to enter into the contract, the board of directors for the AMA renounced the JamSports contracts and directed AMA Pro Racing not to sign the Promotion Agreement. The AMA board did so despite the fact that AMA Pro Racing held itself out as a fully independent corporation and nothing in the JamSports' agreements with AMA Pro Racing made the agreements subject to AMA approval. As a direct result of the AMA's interference, the AMA directors told AMA Pro Racing to breach the agreements it reached with JamSports and, thus, ousted JamSports as the AMA Supercross promoter in direct contravention of the First Agreement and the Promotion Agreement.

### AMA Pro Racing's Breach of Contract – First Agreement

44.     The First Agreement reflected the material terms of the agreed-to relationship with respect to JamSports' promotion of the AMA Supercross series from

2003 through 2009. The First Agreement is itself a binding agreement giving JamSports the right to promote the AMA Supercross series from 2003 through 2009.

45.     Pursuant to the First Agreement, AMA Pro Racing also had an obligation to use its best efforts and negotiate in good faith the terms of the Promotion Agreement a second, more definitive agreement, *i.e.*, the Promotion Agreement.

46.     The purpose of the negotiations, as explicitly stated in the First Agreement, was to enter into a final Promotion Agreement which, in addition to the terms set forth in the First Agreement, would contain "customary covenants, representations, warranties, conditions precedent and indemnification provisions to be agreed upon by the parties for a transaction of this size and nature." (First Agreement, Paragraph 11).

47.     Having encouraged and directed JamSports to expend resources in negotiating the Promotion Agreement and preparing for its performance, AMA Pro Racing was also required to use its best efforts to complete the transaction in good faith.

48.     After notifying JamSports that the deal was complete pending inclusion of its final modifications to the Promotion Agreement and receiving JamSports' acceptance of those terms, AMA Pro Racing was obligated to continue in good faith and sign the Promotion Agreement.

49.     Even after notifying JamSports that it had obtained the approval of its Board of Directors, AMA Pro Racing refused to sign the Promotion Agreement and, subsequently, refused to perform in accordance with the terms of the Promotion Agreement.

50.     AMA Pro Racing's failure to sign the final Promotion Agreement following the conclusion of negotiations with JamSports and approval by AMA Pro

Racing's board demonstrates its bad faith and failure to use its best efforts and to negotiate the Promotion Agreement in breach of the explicit terms of the First Agreement.

51. AMA Pro Racing also breached the First Agreement by failing to deliver to JamSports — and by granting to Clear Channel — the promotion rights that had been contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

52. AMA Pro Racing also materially breached the terms of the First Agreement by:

(a) failing and refusing to negotiate the terms of the Promotion Agreement in good faith;

(b) soliciting, encouraging, entertaining, and/or entering discussions and/or negotiations concerning a promotion agreement with Clear Channel prior to expiration of the exclusive negotiating period under the First Agreement;

(c) failing to promptly notify JamSports of any offers from third parties, including, but not limited to, Clear Channel, as well as the names of the offerors and the terms of the offers; and

(d) communicating the confidential terms of the First Agreement to third parties, including, but not limited to, Clear Channel.

53. JamSports performed or was prepared to perform all of its obligations under the First Agreement.

54. JamSports has been injured by AMA Pro Racing's numerous breaches of the First Agreement. Among other things, JamSports has been injured by AMA Pro Racing's breach of its obligation to use its best efforts and negotiate in good faith, including, but not limited to, its unreasonable refusal to sign the completed Promotion Agreement.

14

## AMA Pro Racing's Breach of Contract - Promotion Agreement

55.     Pursuant to the First Agreement, AMA Pro Racing also had an obligation to negotiate any open issues with respect to the Promotion Agreement in good faith. In any event, given that there were no unresolved issues between the parties, AMA Pro Racing had a good faith obligation to enter into the Promotion Agreement. By virtue of the First Agreement, AMA Pro Racing was so obligated regardless of whether its board of directors — or the board of directors of its parent entity, the AMA — approved the Promotion Agreement.

55.     As of February 8, 2002, at the latest, the parties had entered into a binding Promotion Agreement. AMA Pro Racing's final modifications were accepted by JamSports and JamSports communicated its acceptance on February 8, 2002. Moreover, the board of directors of AMA Pro Racing voted to approve the Promotion Agreement.

57.     JamSports performed or was prepared to perform all of its obligations under the Promotion Agreement.

58.     AMA Pro Racing ultimately refused to provide JamSports with a signed Promotion Agreement and AMA Pro Racing has refused and failed to perform pursuant to the Promotion Agreement. Among other things, AMA Pro Racing failed to deliver to JamSports — and instead granted to Clear Channel — the promotion rights that were contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

59.     JamSports has been injured by AMA Pro Racing's breach of the Promotion Agreement and its breach of its obligation to use its best efforts and to negotiate in good faith under the Promotion Agreement. The parties agreed that

JamSports would produce and promote the AMA Supercross Series events for at least seven (7) years and JamSports' consequential damages include the loss of the business opportunities presented by the Promotion Agreement.

60.     JamSports has also suffered consequential damages that were foreseeable to AMA Pro Racing at the time the parties entered into the Promotion Agreement. JamSports' consequential damages include the loss of the additional business opportunities that were contemplated by the parties, including AMA Pro Racing, at the time that they entered into the Agreement.

## V. CLAIMS FOR RELIEF

### Count I

### Tortious Interference With First Agreement

61.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 60 as this Paragraph 61.

62.     The First Agreement was a binding agreement that, *inter alia*, granted JamSports the right to promote the AMA Supercross series for the 2003-2009 seasons.

63.     The AMA had knowledge of the First Agreement, including its requirements of exclusivity, confidentiality and good faith.

64.     Despite such knowledge, the members of AMA's Board of Directors willfully communicated and negotiated with Clear Channel and its representatives regarding the promotion rights that had been contractually promised by AMA Pro Racing to JamSports with respect to the AMA Supercross series for the 2003-2009 seasons.

65.     The AMA engaged in such communications and negotiations with the malicious purpose and effect of inducing AMA Pro Racing to breach its contractual

16

obligations to JamSports, including the obligations of exclusivity, confidentiality and the obligation to negotiate in good faith the terms of the Promotion Agreement.

66.    Further, the AMA ordered AMA Pro Racing not to sign the Promotion Agreement in direct contravention to the terms of the First Agreement.

67.    The AMA's conduct was malicious, egregious and willfully done with the intent of inducing AMA Pro Racing to breach its contractual obligations with JamSports in favor of granting such rights to Clear Channel.

68.    As a result of the AMA's wrongful conduct, AMA Pro Racing breached the First Agreement, and JamSports has been injured thereby.

**WHEREFORE,** Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant, the American Motorcyclist Association, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs. JamSports further requests that this Court enter an award against the American Motorcyclist Association for punitive damages and for such other and further relief as this Court deems just and appropriate.

### Count II

### Tortious Interference With Promotion Agreement

69.    JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 68 as this Paragraph 69.

70.    The Promotion Agreement was a binding agreement that, *inter alia*, granted JamSports the right to promote the AMA Supercross series for the 2003-2009 seasons.

17

71.     The AMA had knowledge of the Promotion Agreement and the requirements of the First Agreement obligating AMA Pro Racing to negotiate exclusively, confidentially and in good faith with JamSports the terms of the Promotion Agreement.

72.     The AMA also knew that AMA Pro Racing had finalized the terms of the Promotion Agreement and that the board of directors of AMA Pro Racing had voted to approve the Promotion Agreement.

73.     Despite such knowledge, the AMA ordered AMA Pro Racing not to sign the Promotion Agreement.

74.     The AMA's conduct was malicious, egregious and willfully done with the intent of inducing AMA Pro Racing to breach its contractual obligations with JamSports in favor of granting such rights to Clear Channel.

75.     As a result of the AMA's wrongful conduct, AMA Pro Racing breached the Promotion Agreement, and JamSports has been injured thereby.

**WHEREFORE,** Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant American Motorcyclist Association in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs. JamSports further requests that this Court enter an award against the American Motorcyclist Association for punitive damages and for such other and further relief as this Court deems just and appropriate.

### Count III (Alternative Claim)

### Tortious Interference with Prospective Economic Advantage

76.     JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 60 as this Paragraph 76. JamSports pleads this count in the alternative to any claims alleged in this Complaint with respect to which there are necessary allegations that are inconsistent with any allegation in this count.

77.     Pursuant to the First Agreement, JamSports had a reasonable expectation of entering into a valid business relationship with AMA Pro Racing regarding the promotion and production of the Supercross Series from 2003-2009.

78.     The AMA had knowledge of JamSports' expectancy of a valid business relationship with AMA Pro Racing regarding the promotion and production of the Supercross Series from 2003-2009.

79.     Despite such knowledge, the AMA willfully communicated and negotiated with Clear Channel in an effort to interfere with the promotion rights that JamSports reasonably expected to obtain from AMA Pro Racing with respect to the AMA Supercross Series for the 2003-2009 seasons.

80.     The AMA's actions were intentional, unjustified and malicious, and prevented JamSports' business expectancy from developing into a valid business relationship with AMA Pro Racing for the promotion and production of AMA Supercross.

81.     As a result of the AMA's wrongful conduct, AMA Pro Racing entered into a business relationship with Clear Channel with respect to the promotion and production of the AMA Supercross Series, and JamSports has been injured thereby.

**WHEREFORE**, Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant American Motorcyclist Association, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs. JamSports further requests that this Court enter an award against the American Motorcyclist Association for punitive damages and for such other and further relief as this Court deems just and appropriate.

### Count IV (Alternative Claim)

### Breach of Contract - First Agreement

82. JamSports repeats, realleges and incorporates by reference Paragraphs 1 through 60 as this Paragraph 82.

83. At the time it negotiated and entered into the First Agreement, AMA Pro Racing was acting as the alter-ego of the AMA, so that the separate personalities of the AMA and AMA Pro Racing no longer existed.

84. Further, contrary to its representations to JamSports, AMA Pro Racing was so controlled and manipulated by the AMA that it had become a mere instrumentality of its parent corporation.

85. AMA Pro Racing, organized by the AMA, carries on business without substantial capital in such a way that it is unlikely to have sufficient assets to pay its creditors. In fact, in early 2001, the AMA paid a substantial judgment on behalf of AMA Pro Racing without requiring repayment of the debt.

86. The AMA has asserted that AMA Pro Racing could not enter into a binding contract with JamSports without the approval of the AMA. Further, the AMA

claimed to have the right to veto any contractual obligation purportedly entered into by AMA Pro Racing and, in fact, exercised that right against JamSports.

87.     The AMA makes major decisions involving AMA Pro Racing and directs its activities as evidenced by the AMA's direction to AMA Pro Racing as to how it should contract regarding the promotion rights for the 2003 through 2009 AMA Supercross series.

88.     The First Agreement reflected the material terms of the agreed-to relationship with respect to JamSports' promotion of the AMA Supercross series from 2003 through 2009. The First Agreement is itself a binding agreement giving JamSports the right to promote the AMA Supercross series from 2003 through 2009.

89.     Pursuant to the First Agreement, the AMA also had an obligation to use its best efforts and negotiate in good faith the terms of the Promotion Agreement a second, more definitive agreement, i.e., the Promotion Agreement.

90.     The purpose of the negotiations, as explicitly stated in the First Agreement, was to enter into a final Promotion Agreement which, in addition to the terms set forth in the First Agreement, would contain "customary covenants, representations, warranties, conditions precedent and indemnification provisions to be agreed upon by the parties for a transaction of this size and nature." (First Agreement, Paragraph 11).

91.     The AMA, having encouraged and directed JamSports to expend resources in negotiating the Promotion Agreement and preparing for its performance, was also required to complete the transaction in good faith.

92.     After notifying JamSports that the deal was complete pending inclusion of its final modifications to the Promotion Agreement and receiving JamSports' acceptance

of those terms, the AMA was obligated to continue in good faith and sign the Promotion Agreement.

93. Even after notifying JamSports that it had obtained the approval of AMA Pro Racing's Board of Directors, the AMA refused to sign the Promotion Agreement and, subsequently, refused to perform in accordance with the terms of the Promotion Agreement.

94. The AMA's failure to sign the final Promotion Agreement following the conclusion of negotiations with JamSports and approval by AMA Pro Racing's board demonstrates the AMA's bad faith and failure to use its best efforts and to negotiate the Promotion Agreement in breach of the explicit terms of the First Agreement.

95. The AMA also breached the First Agreement by failing to deliver to JamSports — and by granting to Clear Channel — the promotion rights that had been contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

96. The AMA also materially breached the terms of the First Agreement by:

(a) failing and refusing to negotiate the terms of the Promotion Agreement in good faith;

(b) soliciting, encouraging, entertaining, and/or entering discussions and/or negotiations concerning a promotion agreement with Clear Channel prior to expiration of the exclusive negotiating period under the First Agreement;

(c) failing to promptly notify JamSports of any offers from third parties, including, but not limited to, Clear Channel, as well as the names of the offerors and the terms of the offers; and

(d) communicating the confidential terms of the First Agreement to third parties, including, but not limited to, Clear Channel.

97. JamSports performed or was prepared to perform all of its obligations under the First Agreement.

98.   To allow the AMA to hide behind AMA Pro Racing and adhere to the fiction of a separate corporate existence would severely prejudice JamSports and would promote inequitable consequences in that JamSports would be unable to enforce and recover damages under the duly executed First Agreement.

99.   JamSports has been injured by the AMA's numerous breaches of the First Agreement. Among other things, JamSports has been injured by the AMA's breach of its obligation to use its best efforts and negotiate in good faith, including, but not limited to, its unreasonable refusal to sign the completed Promotion Agreement.

100.   JamSports has also suffered damages that were foreseeable to the AMA at the time the parties entered into the First Agreement. The parties agreed that JamSports would produce and promote the AMA Supercross Series events for at least seven (7) years, and JamSports' damages include the loss of the business opportunities presented by that Agreement.

101.   JamSports also incurred consequential damages, including the loss of the additional business opportunities that were contemplated by the parties, including the AMA, at the time that they entered into the First Agreement.

**WHEREFORE,** Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant the American Motorcyclist Association, in the amount to be proven at trial, but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems just and appropriate.  In the alternative, JamSports respectfully requests that this Court enter an order requiring the AMA to (i) specifically perform the First Agreement, (ii)

deliver a signed Promotion Agreement to JamSports, and (iii) specifically perform the Promotion Agreement, and awarding JamSports consequential damages as a result of the AMA's failure to perform to date, and such other and further relief as this Court deems just and appropriate.

## Count V

### Breach of Contract - Promotion Agreement

102.   JamSports repeats, realleges and incorporates by reference Paragraphs 82-101 as this Paragraph 102.

103.   As of February 8, 2002, at the latest, the parties had entered into a binding Promotion Agreement. The AMA's final modifications to the Promotion Agreement were accepted by JamSports and JamSports communicated its acceptance on February 8, 2002. Moreover, the board of directors of AMA Pro Racing voted to approve the Promotion Agreement.

104.   Pursuant to the First Agreement, the AMA also had an obligation to negotiate any open issues with respect to the Promotion Agreement in good faith. In any event, given that there were no unresolved issues between the parties, the AMA had a good faith obligation to enter into the Promotion Agreement. By virtue of the First Agreement, the AMA was so obligated regardless of whether AMA Pro Racing's directors or the AMA's directors approved the Promotion Agreement.

105.   JamSports performed or was prepared to perform all of its obligations under the Promotion Agreement.

106.   The AMA ultimately refused to provide JamSports with a signed Promotion Agreement and it has refused and failed to perform pursuant to the Promotion

Agreement. Among other things, the AMA failed to deliver to JamSports — and instead granted to Clear Channel — the promotion rights that were contractually promised to JamSports with respect to the AMA Supercross series for the 2003 through 2009 seasons.

107. To allow the AMA to hide behind AMA Pro Racing and adhere to the fiction of a separate corporate existence would severely prejudice JamSports and would promote inequitable consequences in that JamSports would be unable to enforce and recover damages under the duly executed Promotion Agreement.

108. JamSports has been injured by the AMA's breach of the Promotion Agreement and its breach of its obligation to use its best efforts and to negotiate in good faith under the Promotion Agreement. The parties agreed that JamSports would produce and promote the AMA Supercross Series events for at least seven (7) years and JamSports' consequential damages include the loss of the business opportunities presented by the Promotion Agreement.

109. JamSports has also suffered consequential damages that were foreseeable to the AMA at the time the parties entered into the Promotion Agreement. JamSports' consequential damages include the loss of the additional business opportunities that were contemplated by the parties, including the AMA, at the time that they entered into the Agreement.

**WHEREFORE,** Plaintiff JamSports and Entertainment, LLC respectfully requests that this Court enter judgment in its favor and against defendant the America Motorcyclist Association, in the amount to be proven at trial but anticipated to be in excess of twenty million dollars ($20,000,000) to compensate JamSports for its actual damages, together with its costs, and for such other and further relief as this Court deems

just and appropriate. In the alternative, JamSports respectfully requests that this Court enter an order requiring the AMA to specifically perform the Promotion Agreement, and awarding JamSports consequential damages as a result of the AMA's failure to perform to date, and such other and further relief as this Court deems just and appropriate.

## VI.    Jury Demand

Plaintiff respectfully requests a jury trial as to all claims herein so triable as of right.

Respectfully submitted,

JAMSPORTS AND ENTERTAINMENT, LLC,

By: _____
One of its Attorneys

Jeffrey Singer
P. Mark Crane
Paul E. Wojcicki
SEGAL McCAMBRIDGE SINGER & MAHONEY, LTD.
One IBM Plaza
330 N. Wabash, Suite 200
Chicago, Illinois 60611
(312) 645-7800

Bruce S. Sperling
Paul E. Slater
Greg Shinall
SPERLING & SLATER
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

Dated this 2 day of April, 2004.

26

JAMSPORTS AND ENTERTAINMENT, LLC
207 West Goethe Street
Chicago, Illinois 60610

November 2, 2001

Mr. Scott Hollingsworth, CEO
AMA Pro Racing
13515 Yarmouth Drive
Pickerington, Ohio 43147

Re:   *Promotion Agreement Between JamSports and Entertainment, LLC ("JamSports") and Paradama Productions, Inc. d/b/a AMA Pro Racing ("AMA Pro Racing") to Promote AMA Supercross Events and Undertake Related Sales and Marketing Matters*

Dear Scott:

AMA Pro Racing, owner of the Supercross Series, and JamSports hereby express their intent to enter into an agreement to promote AMA Supercross events and undertake related sales and marketing matters. AMA Pro Racing and JamSports mutually express their intent to enter into one or more definitive written agreements, which may include a sanctioning agreement, licensing agreement or any other agreements, necessary to document the relationship of the parties (collectively, such agreements are hereinafter referred to as the "Promotion Agreement").

1.   __Framework__.   AMA Pro Racing and JamSports shall agree to produce and promote not less than fourteen (14) and up to a mutually agreed upon number of AMA Supercross events per season (currently January 1 through the first week of May) for a seven (7) year period beginning January 1, 2003, with an opportunity to extend the term based on criteria such as operating issues, financial issues, brand development and event attendance and such other criteria as to be further clarified by the parties hereto. Any references to the "term" of the Promotion Agreement hereinafter shall include any extensions thereof.

2.   __Exclusive Production and Promotion Rights__.   JamSports shall have the exclusive right to produce and promote the AMA Pro Racing Supercross events in North America, with the exception of two (2) events of which AMA Pro Racing reserves the right to directly promote or select a promoter (the "Exception Events"). Subject to the Exception Events (currently anticipated to include the Daytona Beach and California Speedway Supercross events), JamSports shall have the exclusive production and promotion rights for fourteen (14) of the sixteen (16) Supercross events currently included in the season plus any additional Supercross events added in the future. The parties agree that the Exception Events shall not include any Supercross events that would territorially compete with any of the Supercross events promoted by JamSports.

1

3.    **Restrictive Covenant**.  During the term of the Promotion Agreement, Jamsports will not compete with AMA Pro Racing in the area of motorcycle sports events and for a period of two (2) years thereafter, Jamsports will not compete with AMA Pro Racing in the area of motorcycle sports events of the type promoted and produced by Jamsports during the term of the Promotion Agreement.

4.    **Cooperation to Expand Schedule**.  JamSports and AMA Pro Racing shall use their reasonable best efforts to explore opportunities to expand the Supercross event schedule throughout North America, and shall consult with each other to explore such opportunities outside of North America.

5.    **Promotion of Other Events**.  AMA Pro Racing and JamSports shall work cooperatively with each other to identify opportunities for JamSports to promote other AMA Pro Racing owned and sanctioned motorsports events.

6.    **Sanctioning Issues**.

(a)    **Control Over Sporting Matters**.  AMA Pro Racing shall retain control over and responsibility for all sporting matters at the Supercross events, including, without limitation, enforcement of rules and regulations relating thereto, technical matters, track approval, race format and structure.

(b)    **Sanctioning Services**.  AMA Pro Racing shall perform certain services for each Supercross event, which services shall include, without limitation, race control and operations, timing and scoring, technical inspection of equipment, registration of participants, rider medical insurance and track marshals (the "Sanctioning Services"). AMA Pro Racing shall provide JamSports with a more complete list of the Sanctioning Services to be performed by AMA Pro Racing.

(c)    **Sanctioning Fee**.  In return for its performance of the Sanctioning Services, AMA Pro Racing shall receive a sanctioning fee per Supercross event in an amount equal to the cost of such Sanctioning Services, including personnel, overhead and administrative services (the "Sanctioning Fee").  Such Sanctioning Services shall be provided at cost, and AMA Pro Racing shall provide JamSports with full details regarding the Sanctioning Services and the costs thereof.  The initial Sanctioning Fee shall be approximately thirty-one thousand dollars ($31,000.00) per Supercross event.

(d)    **Final Approval of Series Schedule**.  AMA Pro Racing shall retain final approval, which approval shall not be unreasonably withheld, over the Supercross series schedule to ensure appropriate travel patterns, recognition of holidays and similar matters.  AMA Pro Racing and JamSports shall immediately begin discussions regarding the initial schedule for the 2003 Supercross series.  The preliminary 2003 Supercross series schedule shall be available no later than January 31, 2002 (the "Target Date") and shall include at least ten (10) Supercross events (exclusive of the Exception Events).  In the event there are delays in meeting the Target Date, the parties agree that JamSports

shall not be in default of its obligations with respect thereto so long as such delays are not caused by JamSports or by events under the sole control of JamSports.

(e)  **Publication of Series Schedule.**  AMA Pro Racing and JamSports shall cooperate with each other to ensure that the Supercross series schedule is published no later than June 30 of the immediately preceding year for which the schedule is prepared.

7.  **Financial Terms.**

(a)  **Event Revenue Share.**  AMA Pro Racing shall receive the greater of (i) eight percent (8%) of the gross gate receipts (less applicable taxes and facility fees) of each Supercross event, or (b) thirty percent (30%) of Net Income of each Supercross event (in either case, hereinafter referred to as "Revenue Share"), and the remainder of the gross gate receipts or Net Income, as the case may be, of each Supercross event, shall be retained by JamSports.  "Net Income" shall mean gross receipts minus direct costs, and shall be further defined in the Promotion Agreement.

(b)  **Advance.**

(i)  **Timing; Purpose; Amount.**  JamSports shall advance to AMA Pro Racing on a mutually agreed upon date (but not before the second calendar quarter of the calendar year 2002) the (non-refundable) amount of Three Million Dollars ($3,000,000.00) (the "Advance"), which amount shall be used by AMA Pro Racing as general working capital to ensure the success of the Supercross series through the creation of a media and television series that attracts sponsorships.

(ii)  **Recoupment by JamSports.**  JamSports is entitled to and shall recoup the Advance from AMA Pro Racing's Revenue Share.  After JamSports recoups the Advance, JamSports shall commence paying AMA Pro Racing's Revenue Share to AMA Pro Racing.

(c)  **Access to Books and Records.**  An authorized representative of AMA Pro Racing shall be given full access to box office settlement at each Supercross event.  All receipts, including, without limitation, back gate sales, shall be openly reported for each Supercross event, and an accounting shall be provided by JamSports for each Supercross event.

(d)  **Championship Bonuses.**  AMA Pro Racing shall pay to Supercross event participants (i.e., riders) a predetermined amount (currently ranging from $350,000.00 to $400,000.00) in the form of championship bonuses (the "Championship Bonuses").  The parties hereto agree that the amount of such Championship Bonuses shall increase annually at mutually agreed upon increases with AMA Pro Racing having final approval of annual increases.  Championship Bonuses shall be paid by AMA Pro Racing from revenues generated from broadcasting and marketing opportunities.

3

(c) **Other Payments to Participants.** Payments, other than the Championship Bonuses, to riders and teams who participate in the Supercross events shall be the sole responsibility of AMA Pro Racing. Such payments described in this Section 7(e) shall be paid by AMA Pro Racing and shall not be Supercross event expenses.

(f) **Event Purses.** JamSports shall pay seventy thousand dollars ($70,000.00) per Supercross event, which amount shall increase by ten thousand dollars ($10,000.00) each year of the term of the Promotion Agreement. Such amounts described in this Section 7(f) shall be paid out as Supercross event expenses.

8. **Other Revenue Streams.**

(a) **Series Media and Marketing Rights.** AMA Pro Racing shall retain exclusive ownership of and managerial responsibility over all broadcasting and marketing rights. AMA Pro Racing and JamSports together shall use reasonable best efforts to seek out and negotiate broadcasting (including, without limitation, television, radio and webcasting) and marketing opportunities. Each party, with the knowledge and consent of the other party, shall have the right to approach potential broadcasting and marketing partners; *provided, however,* that AMA Pro Racing shall have the final decision on any such broadcasting and marketing partnerships. The Net Income, after Championship Bonuses are paid, from any such broadcasting and marketing partnerships shall be split forty percent (40%) to JamSports and sixty percent (60%) to AMA Pro Racing. For purposes of such broadcasting and marketing rights set forth herein and the Promotion Agreement, the parties agree that the title sponsorship of the Supercross series is part of the Supercross series sponsorship.

(b) **Event Sponsorships.** JamSports shall use reasonable best efforts to seek out and negotiate sponsorships of the Supercross events. Net Income from such Supercross event sponsorships shall be split seventy percent (70%) to JamSports and thirty percent (30%) to AMA Pro Racing; *provided, however,* that in no event shall the available advertising space for Supercross event sponsorships exceed twenty percent (20%) of the total available advertising space in the venue of each Supercross event, except if and to the extent more than twenty percent (20%) of such total available advertising space is available.

(c) **Product Merchandising Revenue.** Product merchandising relating to the Supercross events and Supercross series shall be managed by JamSports, with AMA Pro Racing having final approval over the product design and manner of such product merchandising. Net Income from such product merchandising shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing.

(d) **Internet Merchandising and Audio Visual Products and Other Products.** Merchandising and marketing opportunities relating to audio visual products

4

(including, without limitation, DVD's and videos), video games (but only those provided by suppliers engaged after the date hereof), board games, books, magazines (other than the current AMA Pro Racing magazine(s)) and other event specific products sold through the AMA Pro Racing Supercross website, shall be subject to final approval by AMA Pro Racing, which approval shall not be unreasonably withheld (individually and collectively, the "AV and Other Products"). Net Income from the sale of such AV and Other Products shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing. AMA Pro Racing shall identify the video games (and the respective suppliers thereof) and the AMA Pro Racing magazine(s) (and the publishers thereof) which are currently being sold as of the date hereof and thus expressly excepted herefrom.

9.   **Grant of Right to Use the Marks.** AMA Pro Racing shall grant to JamSports the non-exclusive limited right to use the trademarks and service marks which AMA Pro Racing now or hereafter owns, and/or now or hereafter has the right to use, in connection with all advertising, publicity, promotions and marketing in the performance of its obligations under the Promotion Agreement. AMA Pro Racing shall also grant to JamSports (or, shall use its best efforts to secure for JamSports) a limited right to use any other trademarks and service marks, whether or not owned by AMA Pro Racing, which are usual and customary in the promotion and production of AMA Pro Racing sanctioned Supercross events, as deemed reasonably necessary for the performance of JamSports' obligations under the Promotion Agreement. AMA Pro Racing shall be reasonably available to assist JamSports in creating advertising, publicity, promotional and marketing materials and for publicity support.

10.   **Advertising: Purchaser Information.**

    (a)   **Advertising and Promotion by JamSports.** To the extent that such advertising and promotion is under the control of JamSports, in the advertising and promotion of the Supercross events and related activities, JamSports agrees to the following:

        (i)   **Media Exposure.** JamSports shall use commercially reasonable efforts to ensure exposure of AMA Pro Racing in all advertising media for the promotion and publicity of the Supercross events and related activities, including, without limitation, print, radio, television, Internet and at the venue and to prominently feature the AMA Pro Racing brand in all such advertising.

        (ii)   **Featured Host.** AMA Pro Racing shall be the featured host of all promotional events in connection with the series of Supercross events and related activities to the general public, manufacturers, teams, sponsors and media.

        (iii)   **Display of AMA Pro Racing Brand.** The AMA Pro Racing brand shall be prominently displayed in all media for the entire series of Supercross events and everything relating thereto, including, without limitation, displaying the AMA Pro Racing name on all tickets and press releases.

(b) **Advertising and Promotion by AMA Pro Racing**. To the extent such advertising and promotion is under the control of AMA Pro Racing, in the advertising and promotion of the Supercross events and related activities, AMA Pro Racing agrees to provide JamSports with advertising and promotion rights which are reciprocal to those set forth in Section 10(a) above.

(c) **Purchaser Information**. Provided that such information is available to JamSports and provided that JamSports has the right to do so, JamSports shall use reasonable best efforts to provide AMA Pro Racing with purchaser information, including, but not limited to, name, addresses, telephone numbers and email addresses of those individuals or entities purchasing tickets to Supercross events.

11. **Basic Terms**. The Promotion Agreement between the parties will contain all customary covenants, representations, warranties, conditions precedent and indemnification provisions to be agreed upon by the parties for a transaction of this size and nature.

12. **Confidentiality**. AMA Pro Racing and JamSports each agree that the terms of this letter agreement, and, in particular, its financial terms, are private and confidential. Neither party hereto shall divulge the terms of this letter of intent to any other persons in any manner, except each party may so inform its attorneys, accountants and financial consultants as reasonably necessary for the performance of its obligations hereunder and under the Promotion Agreement, who, however, shall be instructed not to divulge its terms to any other persons except and unless as they may be finally required by law or court process. In the event of a breach of the foregoing, the damaged party may seek recovery of all damages as allowed by law, including, without limitation, injunctive relief.

13. **Exclusivity**. Each of the parties agrees that for a period of ninety (90) days after the date this letter is fully executed by the parties hereto and for a period of , AMA Pro Racing and JamSports shall negotiate exclusively and in good faith with one another, and neither party shall enter into any discussions or negotiations with any third party with respect to the subject matter hereof. If a party hereto shall receive any offer from a third party with respect to the subject matter hereof, the receiving party shall promptly notify the other party hereto of the offer, the name of the offeror and the terms thereof. The parties shall use their best efforts, negotiating in good faith, to enter into the Promotion Agreement within thirty (30) days from the date this letter is fully executed by the parties hereto.

14. **Final Contract**. Except for the obligations set forth in Sections 12, 13 and 16, this letter of intent is not binding in any way upon the parties hereto. This letter of intent is expressly conditioned upon the parties entering into the Promotion Agreement. JamSports' counsel shall prepare and submit to AMA Pro Racing and its counsel a draft of the Promotion Agreement as soon as is reasonably possible after the date upon which this letter of intent is fully executed by the parties hereto.

15. **Closing**. The transaction contemplated hereby shall close no later than ninety (90) days from the date this letter is fully executed by the parties hereto and at such time and

6

place as the parties hereto shall agree upon, subject to the satisfaction or waiver of any conditions precedent to closing which are agreed upon by the parties.

16.     **Publicity.**   Neither party hereto shall issue any press releases or other announcements regarding this letter of intent or the transaction contemplated hereby unless such release or announcement first shall be approved by the other party or shall be required by law.

17.     **Costs**. Each party hereto will be responsible for and bear all of its own costs and expenses incurred at any time in connection with pursuing or consummating the transaction contemplated hereby.

18.     **Entire Agreement.** This letter includes provisions which shall be included in any agreement between the parties and supercedes all prior oral or written agreements, understandings, representations and warranties, and courses of conduct and dealings between the parties on the subject matter hereof. Except as otherwise provided herein, this letter may be amended or modified only by a writing executed by each of the parties hereto.

19.     **Counterparts.** This letter may be executed in counterparts and by facsimile, each of which shall deemed to be an original copy of this letter and all of which, when taken together, shall be deemed to constitute one and the same agreement.

This letter is intended solely as an expression of mutual intent of JamSports and AMA Pro Racing as to certain aspects of the proposed transaction. JamSports and AMA Pro Racing agree that there are material terms as to which agreement has not been reached and this letter is not to be construed as a definitive contract and is subject to the execution of a satisfactory agreement or agreements between the parties as set forth herein.

Very truly yours,

**JAMSPORTS AND ENTERTAINMENT, LLC,**
a Delaware limited liability company

By: _____
    Jerry Mickelson, Manager

AGREED THIS 2ND DAY
OF NOVEMBER, 2001

**PARADAMA PRODUCTIONS, INC. D/B/A
AMA PRO RACING,**
a _____

By: _____
Its: ____CEO_____

7

TOTAL P.08

*jam productions, ltd.*

## FACSIMILE TRANSMISSION COVER SHEET

DATE: 1-29-02

TO: Bill Rodney / VICKI BAVE

COMPANY:

FAX #: 6305328 / 6306335

FROM: Jerry Mickelson

RE: AMA LETTER OF INTENT

PAGES (INCLUDING COVER PAGE): 8

SPECIAL INSTRUCTIONS (IF ANY):

PLEASE READ. WE MUST DISCUSS THIS AS EARLY AS POSSIBLE ON WEDNESDAY MORNING.

THANKS,

Jerry

IMPORTANT: THIS MESSAGE IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEDGED, CONFIDENTIAL AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW.

If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distributed or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the address below via the United State Postal Service. Thank you.

207 WEST GOETHE • CHICAGO, ILLINOIS • 60610 • 312-266-6262 • FAX: 312-266-9588



MAR-01-2002 10:46

13515 Yarmouth Drive, Pickerington, OH 43147-8273
Telephone: (614) 856-1900 Fax: (614) 856-1924
www.amaproracing.com

A subsidiary of the American Motorcyclist Association



November 5th, 2001

Dear Facility Manager,

This letter is to notify you that AMA Pro Racing, sanctioning body for the AMA EA Sports Supercross Series, has entered into an agreement with JamSports, a division of Chicago-based Jam Productions, for the exclusive promotion of AMA Supercross events for the 2003-2009 seasons.

Since 1997, event promotion for AMA Supercross has been managed by PACE/SFX/Clear Channel Entertainment under a long-term commercial development agreement with AMA Pro Racing. That agreement expires at the end of the upcoming 2002 season. AMA Supercross events previously held at your facility and those scheduled for the 2002 season, if any, were organized under this agreement.

AMA Pro Racing hereby authorizes JamSports and/or Jam Productions to negotiate with your facility, on an exclusive basis, regarding the organization and production of future AMA Supercross events.

AMA Pro Racing represents more than 75 years of racing history as the premiere sanctioning body for motorcycle sport in the United States. Our various Championships enjoy support from major manufacturers including Honda, Yamaha, Suzuki, Kawasaki, KTM, Husqvarna, Ducati, , Harley-Davdison, Buell and others. The stars of motorcycle sport are made by winning AMA Championships - we look forward to making more history at your facility.

Should you have any questions regarding this matter please contact me at 614-856-1900.

Best regards,

Scott Hollingsworth
Chief Executive Officer
AMA Pro Racing



*Welcome to amaproracing.com: The official website of AMA Pro Racing*

**Join an official AMA Pro Racing Fantasy Racing league now!**

results archive  race calendar  racing on TV  fantasy racing  who's this racer  news  features  meet the pros  rulebook & schedule  driver info  contact us  ride



**2002 AMA Chevy Trucks U.S. Superbike Championship**
rounds: 3/6-10  4/5-7  5/3-5  5/17-19  5/31-6/2  6/7-9  6/28-30  7/11-14  7/26-28  8/9-11



# THE BEAST OF BOTH WORLDS.

**home / news**

February 27, 2002

continued: page 1 | 2 | 3



**2002 AMA U.S. Hillclimb Championship presented by Pace American 2001 rounds**



**2001 Motocross des Nations**

**pro poll**
updated 2-25

Daytona's almost here: Who will win the March 8 Pro Honda Oils Supersport race?

results  previous polls

**who's this racer? contest**

Want some free tires? Thought so. If your answer is randomly picked in our monthly contest, you get a new pair of Dunlop skins.

This month:

November 6, 2001

## AMA Pro Racing announces new partner for AMA U.S. Supercross Championship Series commencing 2003 season

AMA Pro Racing has selected JamSports and Entertainment as its new promoter partner for the AMA U.S. Supercross Championship Series commencing with the 2003 season and extending through the 2009 season. JamSports is a division of Chicago-based Jam Productions, the largest independent producer of live events in North America.

The decision was made by the Board of Directors of AMA Pro Racing after evaluating proposals from several companies, including Clear Channel Entertainment, the current promoter of AMA Supercross events. This current promotional agreement between Clear Channel and the AMA expires at the end of the 2002 season.



**Ricky Carmichael will be riding red in 2002, starting with the 2002 AMA Supercross Series Jan. 5.**

photo by Honda



"We'd like to thank Clear Channel Entertainment for its significant contributions to AMA Supercross over the past several years," said Scott Hollingsworth, chief executive officer of AMA Pro Racing. "The board felt this was the appropriate time to take a long, hard look at our expectations for the future of AMA Supercross and, in particular, the type of relationship we should develop with our business partners. Several proposals were considered, but JamSport's stood out, as did the quality of executive firepower they were prepared to commit to the future of the sport."

Mark Tuttle, chairman of the AMA Pro Racing board of directors added, "I am pleased that after considering a variety of complex issues, at the end of this arduous process the board of directors reached a decision regarding the best



**multimedia showcase**

**AMA Superbike commercials**
If you missed the new Chevy Trucks Superbike commercials on Speedvision last year, you can view them here.

*"Gauge"* (30 sec.)
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Prayer"* (30 sec.)
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Fastest"* (10 sec.)
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

**Daytona coverage**
Check out our comprehensive coverage of the AMA racing during Daytona Bike Week!
- Daytona 2001
- '00, '99

long-term alternative without dissension."

Jerry Mickelson, a principal of JamSports, stated, "We are delighted to have this opportunity to work with the AMA and AMA Pro Racing and appreciate the trust they have shown us by placing part of their 75 years of racing history in our hands. Our objectives are to deliver powerful and successful live events along with great television coverage – the platform for turning AMA Supercross riders into household names. We expect to provide the manufacturers and sponsors value for their investment beyond their highest expectations."

Tony Dimitriades, also a principal in JamSports, added, "We are convinced that the growth of Supercross is best accomplished by strengthening even further the relationship among all participants, by respecting the differing points of view and recognizing the contribution of each."

The 2003 season will feature a 16-race schedule at stadiums in major markets, including some major media markets not currently on the AMA Supercross schedule. Early confirmation of some events for the 2003 season will be made in coming weeks and a ground-breaking new television agreement is under development.

The 2002 season of AMA EA Sports Supercross presented by Speed Stick kicks off on Saturday, January 5, at Edison Field in Anaheim, California, in what's sure to be another exciting year of racing. Go to ticketmaster.com for information regarding ticket availability.

AMA Pro Racing is the leading sanctioning body for professional motorcycle sport in the United States. For more information about AMA Pro Racing, please contact Connie Fleming at (614) 856-1900. JamSports is the sports division of Chicago-based Jam Productions, the largest independent producer of live events in North America. For more information on JamSports, please contact Larry Solters at (213) 639-6169.

**AMA Pro Racing announces new partner for AMA U.S. Supercross Championship Series commencing 2003 season continued. . .**

page: 1 | 2 | 3

top

*AMA Pro Racing news release. Reprinting text is accepted.*



Welcome to amaproracing.com: The official website of AMA Pro Racing

## Join an official AMA Pro Racing Fantasy Racing league now!

results and news race calendar racing on TV fantasy racing who's this racer news features meet the pros rulebook & bulletins pro jobs contact us ride



# THE BEAST OF BOTH WORLDS.



**2002 AMA Chevy Trucks U.S. Superbike Championship**
rounds: 3/6-10 4/5-7 5/3-5 5/17-19 5/31-6/2 6/7-9 6/28-30 7/11-14 7/26-28 8/9-11



**2002 AMA U.S. Hillclimb Championship presented by Pace American**
2001 rounds



**2001 Motocross des Nations**

**pro poll**
updated 2-25

**Daytona's almost here:
Who will win the March
8 Pro Honda Oils
Supersport race?**

results previous polls

**who's this
racer? contest**

Want some free tires?
Thought so. If your
answer is randomly picked
in our monthly contest,
you get a new pair of
Dunlop skins.

This month:

## home / news

February 27, 2002

*December 3, 2001*

## AMA Pro Racing, JamSports partner with Indianapolis Motor Speedway

AMA Pro Racing, the leading
sanctioning body for motorcycle sport in
the U.S., and its new Supercross
promotional partner, JamSports, today
announced a strategic alliance with the
Indianapolis Motor Speedway
Corporation (IMS).



Initially, IMS Productions, the
corporation's broadcast arm and video-
production company, will work with
AMA Pro Racing and JamSports to
develop and execute long-term
television plans for the AMA U.S.
Supercross Championship, beginning
with the 2003 season. The three

*IMS Productions produces The Indy 500,
The Brickyard 400 and The Formula One
U.S. Grand Prix race each year.*

organizations also will collaborate to cross-market AMA Supercross and other
AMA Pro Racing series with the Indy Racing League and other IMS motorsports
properties.

"IMS Productions has tremendous experience in producing racing broadcasts,"
said Tony George, president and CEO of the Indianapolis Motor Speedway.
"Our alliance with AMA Pro Racing will benefit both organizations -- and since
Indy Racing and AMA Supercross share fans, we're confident that both sports
will grow as a result."

"Partnering with the Indianapolis Motor Speedway Corporation was our number-
one choice," said Mike Held, a JamSports principal responsible for television
and marketing. "Mr. George's commitment to motorsports, in all its forms, is
unparalleled, and IMS Productions' experience in building brands through
television packages for The Indy 500, The Brickyard 400 and The Formula One
U.S. Grand Prix provides a solid foundation for the future of our television
product. With that support behind us, we believe that AMA Supercross will get
the attention it deserves."

Scott Hollingsworth, CEO of AMA Pro Racing, added: "IMS Productions'
position in the market is an invaluable asset that positions us for some big
moves in television. Having a partner with the reputation and resources of the
Indianapolis Motor Speedway Corporation will help advance the AMA Pro
Racing brand, as well as our vision for professional motorcycle racing."



## multimedia showcase

**AMA Superbike commercials**
If you missed the new Chevy Trucks Superbike commercials on Speedvision last year, you can view them here.

*"Gauge" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Prayer" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Fastest" (10 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

**Daytona coverage**
Check out our comprehensive coverage of the AMA racing during Daytona Bike Week!
- Daytona 2001
- '00, '99

The 2003 AMA Supercross season will consist of 16 events in stadiums across the United States. The 2003 AMA U.S. Supercross Championship will begin in Los Angeles, visit many of the major media markets in the country, and conclude in New York, where the champion will be crowned.

Beginning with the 2003 season, IMS Productions will work with AMA Pro Racing and JamSports in other facets of television marketing and broadcast agreements. IMS Productions will also aid in the design and development of AMA Pro Racing broadcasts, including talent selection and support programming.

## About IMS Productions

IMS Productions is a full-service television production company, featuring an digital mobile unit, studios and editing facilities. The company has produced the world feed for the Indianapolis 500-Mile Race since 1988, and every Indy Racing League telecast to date in conjunction with ABC Sports. It also produces the host feed for the SAP United States Grand Prix Formula One race and the ABC broadcast of the race.

The company has successfully produced other sports and entertainment feature programming as well, such as college basketball and professional hockey. In addition, IMS Productions has provided facilities for the FOX and CBS networks for professional sports broadcasts, as well as concerts and game show broadcasts.

## About JamSports

JamSports is a team of business professionals, with a rich history in entertainment and racing with many years of collective motorsports experience from every discipline: Series Promotion, Event Promotions, Race Team Ownership, Sponsorship Acquisition and Driver/Rider Management. Jam is the largest independent producer of entertainment events in the United States. With over a quarter century of expertise in production and stadium entertainment, JamSports has a successful track record in developing, producing, scaling, financing, marketing and merchandising live events and television and creating integrated branding/marketing strategies for increased revenue and mass consumer recognition.

*AMA Pro Racing is the leading sanctioning body for professional motorcycle sport in the United States. For more information about AMA Pro Racing, visit www.amaproracing.com.*

top

*AMA Pro Racing news release. Reprinting text is accepted.*



*Welcome to amaproracing.com: The official website of AMA Pro Racing*

### Join an official AMA Pro Racing Fantasy Racing league now!

results archive  race calendar  racing on TV  fantasy racing  who's this racer  news  features  meet the pros  referees & bulletins  pro ops  contact us  ride



**2002 AMA Chevy Trucks U.S. Superbike Championship**
rounds: 3/6-10 4/5-7 5/3-
5 5/17-19 5/31-6/2 6/7-9
6/28-30 7/11-14 7/26-28
8/9-11



**2002 AMA U.S. Hillclimb Championship presented by Pace American 2001 rounds**

**2001 Motocross des Nations**



### pro poll
updated 2-25

**Daytona's almost here: Who will win the March 8 Pro Honda Oils Supersport race?**

results  previous polls

### who's this racer? contest

Want some free tires? Thought so. If your answer is randomly picked in our monthly contest, you get a new pair of Dunlop skins.

This month:



# THE BEAST OF BOTH WORLDS.

## home / news

February 27, 2002

*December 7, 2001*

## AMA Pro Racing, JamSports announce television partnership with Speedvision network to telecast live AMA Supercross events
*Speed Channel to Air Three Hours of Live AMA Supercross Events Beginning in 2003*

AMA Pro Racing, the leading sanctioning body for motorcycle sport in the U.S., and its new Supercross promotional partner, JamSports, today announced a television partnership with Speedvision Network. Speedvision, the first and only 24-hour cable network devoted exclusively to the excitement and heart-pumping action of motor sports, is being re-launched early next year as Speed Channel.



Beginning in 2003, Speed Channel will broadcast three hours of live, national television coverage of every AMA U.S. Supercross Championship race in each venue.

Beginning in 2003, Speed Channel will broadcast three hours of live, national television coverage of every AMA U.S. Supercross Championship race in each venue. Speed Channel will also promote each event weekly prior to telecast. In addition, AMA Pro Racing has the option to take eight 250-class programs to another television network. The television partnership runs through the 2005 season, with an option to extend.

"Our television package is a home run," said Scott Hollingsworth, CEO of AMA Pro Racing. "Live coverage of AMA Supercross benefits fans, teams and riders and is the single most important element in growing the sport in the future. The nearly 50% increase in coverage provides opportunities to build the fan base, develop rider personalities and serve the commercial needs of teams, riders and sponsors."

"A consistent, live programming schedule, week in and week out, from January to May is by far the most important component to ensure the growth of AMA Supercross," said Mike Held, a JamSports principal responsible for television and marketing. "This, along with the commitment of our partners at Speed Channel and Indianapolis Motor Speedway will give these amazing athletes national exposure on a level never before available."

"Speed Channel is thrilled to finally be able to bring live Supercross coverage to



our loyal motorcycle viewers," said Jim Liberatore, president, Speedvision Network. "We have been partners with the AMA since the start of Speedvision six years ago, and we share their vision for the future of Supercross."

The 2003 AMA Supercross season will consist of 16 events in stadiums across the United States. The 2003 AMA Supercross Championship will begin in January in Los Angeles, visit many of the major media markets in the country, and conclude in New York in May, where the champion will be crowned.

## multimedia showcase

**AMA Superbike commercials**
If you missed the new Chevy Trucks Superbike commercials on Speedvision last year, you can view them here.

*"Gauge" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Prayer" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Fastest" (10 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

**Daytona coverage**
Check out our comprehensive coverage of the AMA racing during Daytona Bike Week!
- Daytona 2001
- '00, '99

### About JamSports
JamSports is a team of business professionals, with a rich history in entertainment and racing with many years of collective motorsports experience from every discipline: Series Promotion, Event Promotions, Race Team Ownership, Sponsorship Acquisition and Driver/Rider Management. Jam is the largest independent producer of entertainment events in the United States. With over a quarter century of expertise in production and stadium entertainment, JamSports has a successful track record in developing, producing, scaling, financing, marketing and merchandising live events and television and creating integrated branding/marketing strategies for increased revenue and mass consumer recognition.

### About Speed Channel
Speed Channel, which celebrates its sixth anniversary in January 2002, is the first and only 24-hour cable network devoted exclusively to motor sports and the human fascination for speed. Speed Channel is home to much of the world's marquee racing events including CART, F1, Classic Cars, LeMans, the American LeMans Series, World Rally and car shows from around the globe. Currently seen in more than 45 million homes, Speed Channel was acquired by Fox Cable Networks Group in July 2001.

Next year, Speed Channel will carry three hours of live coverage of the Daytona Supercross event. Beginning in 2003, Speed Channel will start its season with the AMA Supercross series, then move into high gear with AMA Superbikes, World Superbikes and World GP's. In addition, Speed Channel will air two weekly programs, "Bike Week" and "Motorcyclist," dedicated to motorcycle coverage.

For more information (AMA Pro Racing):
Jeff Mochal
Brener Zwikel & Associates, Inc.
6901 Canby Avenue, Suite 105, Reseda, CA 91335
Ph: 818-344-6195 x121
Fax: 818-344-1714
e-mail: JeffM@bzapr.com
www.amaproracing.com

For more information (JamSports):
Janie Hoffman
S c o o p  MARKETING
3701 Wilshire Boulevard
Los Angeles CA 90010
Ph: 213-639-6195
Fax: 213-639-3950
e-mail: hoffman@sotters.com

*AMA Pro Racing is the leading sanctioning body for professional motorcycle sport in the United States. For more information about AMA Pro Racing, visit www.amaproracing.com.*









*Welcome to amaproracing.com: The official website of AMA Pro Racing*

**Join an official AMA Pro Racing Fantasy Racing league now!**

results archive   race calendar   racing on TV   fantasy racing   who's this racer   news   features   meet the pros   rulebook & bulletins   pro jobs   contact us   ride



**2002 AMA Chevy Trucks U.S. Superbike Championship**
rounds: 3/6-10  4/5-7  5/3-5  5/17-19  5/31-6/2  6/7-9  6/28-30  7/11-14  7/26-28  8/9-11



**2002 AMA U.S. Hillclimb Championship presented by Pace American**
2001 rounds



**2001 Motocross des Nations**

**pro poll**
updated 2-25

**Daytona's almost here:** Who will win the March 8 Pro Honda Oils Supersport race?

results  previous polls

**who's this racer? contest**

Want some free tires? Thought so. If your answer is randomly picked in our monthly contest, you get a new pair of Dunlop skins.

This month:



# THE BEAST OF BOTH WORLDS.

## home / news

February 27, 2002

✆ ✉ e-mail this

*December 21, 2001*
## JamSports, AMA Pro Racing announce 2003 AMA Supercross markets

JamSports and AMA Pro Racing today announced the list of major-market cities that will constitute the 2003 AMA U.S. Supercross Championship. The season will kick off in Los Angeles on January 4 and conclude in New York on May 3.

The cities included in the 2003 AMA U.S. Supercross season are: New York, Los Angeles (two rounds), Atlanta, Dallas, Houston, Phoenix, Indianapolis, Las Vegas, Washington D.C., San Francisco, Boston, New Orleans, Charlotte, Tampa, and Daytona.

The 2003 markets reinforce JamSports' and AMA Pro Racing's commitment to spread the AMA U.S. Supercross Championship geographically and to include more heavily populated areas that better represent the entire country.



Travis Pastana will be riding with the big boys next month. Can he win immediately in the 250 class?
Steve Bruhn photo

"It was extremely important that our 2003 series send a clear signal of our commitment to the sport and its incredibly talented athletes," said Jerry Mickelson a principal in JamSports. "We are dedicated to growing AMA Supercross, and we will not allow cost factors, yesterday's excuses or obstructions of any kind to deter us from doing the right thing."

John Farris, AMA Pro Racing vice president of commercial development, concludes, "The announcement of these markets comes as a result of extensive conversations with our participants, our television partners who help us promote the series and its stars, and current and prospective sponsors of both the Championship and the teams. Brands like Chevy Trucks, Budweiser and Parts Unlimited sell their products nationwide. In 2003, we will deliver a superior marketing platform that will take AMA Supercross across the country, into a great list of major markets."



## multimedia showcase

**AMA Superbike commercials**
If you missed the new Chevy Trucks Superbike commercials on Speedvision last year, you can view them here.

*"Gauge" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Prayer" (30 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

*"Fastest" (10 sec.)*
MediaPlayer: Cable | 56K
Real: Cable | 56K
QuickTime: Cable | 56K

**Daytona coverage**
Check out our comprehensive coverage of the AMA racing during Daytona Bike Week!
- Daytona 2001
- '00, '99

JamSports' Tony Dimitriades adds, "We have tried to demonstrate that in this new era of AMA Supercross we will listen to the needs of everyone who has a stake in the growth of the sport. Our series will be showcased in the largest markets available and the riders and sponsors will benefit from exposure in seven of the top-10 markets in the country."

"I am delighted with the new relationship with JamSports," said Scott Hollingsworth, CEO, AMA Pro Racing. "The next era of growth of AMA Supercross is dependent upon live television and nationwide markets. We were excited to announce this month a live television package with Speed Channel, and now we have markets in place that will ensure AMA Supercross is seen by fans coast-to-coast. Combine that with the heritage of the AMA Championship, our rulebook and our plan to ensure rider participation in the growth of the sport, and the foundation is solidly set for a successful season in 2003 and beyond."

For the first-time in the 29-year history of AMA Supercross, the 2003 AMA Supercross Championship will be broadcast LIVE nationally on Speed Channel. Speed Channel will also promote each race in every venue weekly prior to telecast, providing racing fans with a consistent, live schedule of the best riders in the world.

### About JamSports

JamSports is a team of business professionals, with a rich history in entertainment and racing with many years of collective motorsports experience from every discipline: Series Promotion, Event Promotions, Race Team Ownership, Sponsorship Acquisition and Driver/Rider Management. Jam is the largest independent producer of entertainment events in the United States. With over a quarter century of expertise in production and stadium entertainment, JamSports has a successful track record in developing, producing, scaling, financing, marketing and merchandising live events and television and creating integrated branding/marketing strategies for increased revenue and mass consumer recognition.

*AMA Pro Racing is the leading sanctioning body for professional motorcycle sport in the United States. For more information about AMA Pro Racing, visit www.amaproracing.com.*



top

*AMA Pro Racing news release. Reprinting text is accepted.*

02-  -2002  FROM: AMER. MOTORCYCLIST    6148561924         -550  P 002/002  F-717



13515 Yarmouth Drive, Pickerington, OH 43147-8273
Telephone: (614) 856-1900  Fax: (614) 856-1924
www.amaproracing.com

*A subsidiary of the American Motorcyclist Association*

February 1, 2002

Mr. Jerry Mickelson
Manager
JamSports and Entertainment, LLC.
312 West Goethe
Chicago, IL 60610

Dear Jerry,

This letter is to inform you that the exclusive negotiating period provided under the Letter of Intent dated November 2, 2001 between JamSports and AMA Pro Racing has been extended until 12:00am on Wednesday, February 6th, 2002.

We look forward to continuing the good faith efforts both parties have shown in attempting to conclude the agreement contemplated under the Letter of Intent.

Best regards,

Scott Hollingsworth
Chief Executive Officer
AMA Pro Racing



February 5, 2002


Scott Hollingsworth
AMA Pro Racing

Via fax (614) 856-1924

Re: AMA Pro Racing & JamSports

Dear Scott,

Pursuant to our telephone conversation we are disappointed that we have been unable to discuss with your Board the issues that concern them regarding the finalization of our contract.

You have informed us of the requirement by your Board that the $3 million advance must be nonrefundable. We agree to a nonrefundable $3 million advance with terms consistent with the Letter Of Intent.

We will sign the agreement accordingly and have informed our attorneys.

This remains our position unless and until such time we inform you otherwise.

Yours sincerely,

Tony Dimitriades                    Jerry Mickelson

12441 Ventura Court, Studio City, CA 91604 * 818-985-4377 * 818-985-4178
207 West Goethe * Chicago, IL 60610 * 312-266-6262 * Fax: 312-266-9568



**PIPER**
MARBURY
**RUDNICK**
& WOLFE

WRITER'S INFORMATION
203 North LaSalle Street, Suite 1800
Chicago, Illinois 60601-1293
www.piperrudnick.com

vicki.baue@piperrudnick.com
PHONE (312) 368-3407
FAX (312) 630-6335

PHONE (312) 368-4000
FAX (312) 236-7516

February 8, 2002

*VIA FACSIMILE (614/856-1924)*
*AND EMAIL*

Mr. Scott Hollingsworth
AMA Pro Racing
13515 Yarmouth Drive
Pickerington, Ohio 43147

*VIA FACSIMILE (614/280-9675)*
*AND EMAIL*

Kevin Shoemaker, Esq.
Shoemaker, Winkler, Howarth & Taylor, LLP
41 E. Broadway St., Suite 2001
Columbus, Ohio 43215

*Re: Promotion Agreement between AMA Pro Racing and JamSports and Entertainment,*
*LLC ("JamSports") (the "Promotion Agreement")*

Gentlemen:

Pursuant to my letter sent on behalf of JamSports dated February 5, 2002 and subsequent discussions between the parties, JamSports has agreed that the $3,000,000 Advance will be non-refundable with terms consistent with those set forth in the Letter of Intent. Accordingly, we have attached hereto the Revised Promotion Agreement which reflects the necessary changes.

Very truly yours,

PIPER MARBURY RUDNICK & WOLFE

Vicki J. Baue

VJB/ss
Attachment (sent via email)
cc:     Jerry Mickelson
        Tony Dimitriades
        William A. Rudnick, Esq.

CHG01:30101163.v2 2/8/02

CHICAGO   WASHINGTON : BALTIMORE : NEW YORK : PHILADELPHIA : TAMPA : DALLAS : RESTON   LOS ANGELES

# AMA SUPERCROSS PROMOTION AGREEMENT

THIS AMA SUPERCROSS PROMOTION AGREEMENT (this "Agreement") is entered into as of this ___ day of _____, 2002 (the **"Effective Date"**) by and between Paradama Productions, Inc., d/b/a AMA Pro Racing (**"AMA Pro Racing"**) and JamSports and Entertainment, LLC (**"JamSports"**).

WHEREAS, AMA Pro Racing is the licensed manager of the American Motorcyclist Association AMA Supercross Series (the "Series" ) or the "Supercross Series"); and,

WHEREAS, JamSports is qualified to promote the ~~AMA~~ Supercross Series and the events that make up the Series; and,

WHEREAS, AMA Pro Racing and JamSports wish to enter into a long-term agreement for the marketing, promotion and production of the Supercross Series and a certain number of the events that make up the Supercross Series:

THEREFORE, in consideration of the mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Series Title**. The Series shall be referred to as the AMA [SPONSOR NAME] U.S. Supercross Championship or such other name to identify the Series as determined by AMA Pro Racing.

2. **Term**.

   (a) **Initial Term; Renewal**. The initial term of this Agreement shall include seven (7) AMA Supercross Seasons (currently January 1 through the first week of May (the **"Supercross Season"**) beginning on January 1, 2003 and ending at the conclusion of the final event of the Supercross Season of 2009 (the **"Initial Term"**). ~~JamSports' performance with respect to certain performance categories shall be measured against the performance standards set forth in Addendum A, as may be amended from time to time, including Attendance, Markets/Venues, Quality Events and Active Promotion of Events (the "Performance Standards").~~

   At any time after the end of the Supercross Season of 2006 and before the end of one week after the Supercross Season of 2008, if the Renewal Conditions as set forth in Addendum A hereto are satisfied, the Initial Term shall automatically be renewed upon identical terms for one (1) additional term of four (4) years (the **"Renewal Term"**). ~~Once the Renewal Conditions are satisfied during the Initial Term as provided herein, JamSports shall be required to meet the Renewal Conditions set forth in Addendum A Sections (a)(3) and (a)(4) during the remainder of the Initial Term, or the rights set forth under Section 2(e) below shall apply if JamSports fails to do so.~~ Any references to the **"Term"** of this Agreement shall include the Initial Term and any Renewal Term and any extensions thereof.

Upon satisfaction of the Renewal Conditions, JamSports shall give written notice to AMA Pro Racing that the Renewal Conditions have been satisfied (a "**Renewal Notice**"). Unless AMA Pro Racing delivers to JamSports written notice that it disputes the Renewal Notice within ten (10) days of delivery of such Renewal Notice (the "**Dispute Period**"), AMA Pro Racing shall be deemed to agree that JamSports has satisfied such Renewal Conditions for purposes of the automatic renewal under this Section 2(a).

(b) <u>New Performance Standards; Rolling Renewal</u>. Provided that the Renewal Conditions have been satisfied, during the sixth (6th) year of the Initial Term the parties shall negotiate in good faith to establish any new ~~Performance Standards~~ <u>performance standards</u> (the "New Performance Standards") which are reasonable and shall be effective as of the first (1st) year of the Renewal Term. In the event the parties are unable to agree upon New Performance Standards, the Term of this Agreement shall terminate no ~~later~~ <u>earlier</u> than the end of the 2013 Supercross Season~~, unless earlier terminated as otherwise provided in this Agreement~~.

Beginning with the first (1st) year of the Renewal Term, each year that JamSports satisfies the New Performance Standards, the Term of this Agreement shall automatically be extended upon identical terms for an additional one (1) year added to the end of the then existing Term, resulting in a rolling four (4) year remaining Term.

Upon satisfaction of the New Performance Standards and prior to the end of the then current calendar year, JamSports shall deliver to JamSports a Renewal Notice to AMA Pro Racing. Unless AMA Pro Racing delivers a Dispute Notice during the Dispute Period, AMA Pro Racing shall be deemed to agree that JamSports has satisfied the Renewal Conditions for purposes of the automatic extension of the Term under this Section 2(b).

~~(c) Termination. In the event that AMA Pro Racing determines that JamSports has failed to satisfy the Renewal Conditions set forth in Addendum A Sections (a)(3) or (a)(4), relative to any Supercross event during a Supercross Season, AMA Pro Racing may give written notice of noncompliance (a "Notice of Noncompliance") to JamSports within three (3) days of the end of such Supercross event. Unless JamSports delivers to AMA Pro Racing written notice that it disputes the Notice of Noncompliance within three (3) days of delivery of such Notice of Noncompliance, JamSports shall be deemed to agree that JamSports was not in compliance with the Renewal Conditions. If it is finally determined (after Notice of Noncompliance, as applicable) that JamSports has either failed to promote and produce Supercross events in eight (8) of the thirty-five (35) largest markets in North America during any Supercross Season and such failure is due solely to the fault of JamSports, or failed to comply with Addendum A Sections (a)(3) or (a)(4) three (3) times during any Supercross Season, AMA Pro Racing may give written notice of termination of this Agreement to JamSports no later than twenty (20) days after the end of the final event of such Supercross Season to be effective immediately following the final Supercross event of the next succeeding Supercross Season. For purposes of this Section 2(c), the three (3) occurrences of noncompliance must occur within the same Supercross Season. In the event the Revised Marketing Plan (as defined in Section 13 below) is enacted, the termination provisions in this Section 2(c) shall not apply.~~

3

For purposes of this Agreement, references to "markets" shall mean the market areas as determined by the Standard Metropolitan Statistical Areas (as defined by the U. S. Census Bureau) (the "SMSA"), and the "largest markets" shall be those determined by the SMSA.

3. **Production and Promotion.** Subject to Section 13 below, JamSports agrees to produce and promote a minimum of fourteen (14) events each Supercross Season of the Series during the Term of this Agreement. AMA Pro Racing and JamSports shall mutually agree upon the number and location of the events that will be included in the Series. JamSports shall have the exclusive right to produce and promote all of the events of the Series in North America (which number of events shall not be less than fourteen (14) and shall not include the Exception Events), with the exception of two (2) events for which AMA Pro Racing reserves the right to directly promote or select a promoter (the "**Exception Events**"). The Exception Events are currently anticipated to include the Daytona Beach, Florida Supercross event, *provided, however,* that any Exception Event may include any Supercross event that would not take place in the same market with any other Supercross event scheduled for the next Supercross Season by JamSports, subject to the immediately succeeding paragraph. JamSports hereby agrees that any Exception Event that is held at Daytona Beach, Florida or the California Speedway shall not be a violation of this paragraph.

Notwithstanding anything contained in this <u>Section 3</u> to the contrary, on or before May 30th of each calendar year, JamSports may identify four (4) markets (other than Daytona Beach, Florida or the California Speedway) for the following Supercross Season (in addition to the scheduled markets for such Supercross Season) in which AMA Pro Racing shall not conduct an Exception Event during such following Supercross Season.

4. Participation by Manufacturers and Riders. AMA Pro Racing and JamSports each acknowledges and agrees that this Agreement is entered into with the expectation of adequate participation by the motorcycle manufacturers and Supercross riders. AMA Pro Racing agrees to, and shall use commercially reasonable efforts to, encourage and solicit Adequate Participation (as defined below) by the motorcycle manufacturers and Supercross riders in the Series during the term of this Agreement.

"Participation" shall mean that a motorcycle manufacturer enters the Series and participates in the events utilizing: (i) a rider or riders on the payroll of the manufacturer, (ii) equipment suitable for competition, (iii) support equipment (including trucks) and (iv) personnel, with all such factors being of stature consistent with past practices.

"Adequate Participation" shall mean:

(a) Participation by three (3) of the four (4) Major Motorcycle Manufacturers (as defined below) for the 2003 and 2004 Supercross Seasons or, in the absence of direct involvement, involvement by "factory supported" race teams consistent with past practices; provided, however, that if there are less than four (4) Major Motorcycle Manufacturers (due to merger, joint venture or other business combination), Participation as set forth in Section 4(b) below shall apply and this Section 4(a) shall not apply. "Major Motorcycle Manufacturers" shall mean Honda, Kawasaki, Yamaha and Suzuki. The term "factory supported" shall mean any race teams

recognized by such Major Motorcycle Manufacturers as their respective principal racing effort; or

(b) Participation by two (2) of the Major Motorcycle Manufacturers combined with participation by both KTM and Husqvarna for the 2003 and 2004 Supercross Seasons or, in the absence of direct involvement, involvement by "factory supported" race teams consistent with past practices.

5. **Cooperation to Expand Schedule.** JamSports and AMA Pro Racing shall use their reasonable best efforts to explore opportunities to expand the Supercross event schedule throughout North America, and shall consult with each other to explore such opportunities outside of North America.

6 5. **Promotion of Other Events.** AMA Pro Racing and JamSports shall work cooperatively with each other to identify opportunities for JamSports to promote other AMA Pro Racing owned and sanctioned motorsports events.

7 6. **Control of Events.**

(a) **By AMA Pro Racing.** AMA Pro Racing shall have exclusive control over any and all AMA Pro Racing on-track activities pursuant to Section 8 7 below. AMA Pro Racing shall have the right to approve (or reject) proposed locations for Supercross events; *provided, however,* that any such approval shall not be unreasonably withheld or delayed. If AMA Pro Racing rejects any proposed location by JamSports, such rejection shall not be unreasonably delayed and shall be in writing with the reasons set forth with specificity. AMA Pro Racing shall have final approval over any and all exhibitions to be presented at the Supercross events.

(b) **By JamSports.** Except as otherwise provided herein, JamSports shall perform all of the normal and customary duties incident to promoting and producing a Supercross event and shall have sole and exclusive control over the conduct of the Supercross events and/or the personnel and activities associated therewith, including, but not limited to, management, supervision and control of the Supercross events (but expressly excluding the on-track activities or other activities controlled by AMA Pro Racing), the facilities and surrounding grounds (but only to the extent the facilities and surrounding grounds are intended to be and are used in the conduct of the Supercross events, such as use of the parking areas as the pits for participants), and race spectators (but only while the spectators are within the venue in which the Supercross event is being held and excluding facilities and surrounding grounds except to the extent expressly provided in this Section 7(b) 6(b)). JamSports shall perform and provide the labor and materials for the promotion and production of the Supercross events and shall be responsible for the condition of the premises upon which the Supercross event is scheduled. JamSports shall be responsible for any and all labor and materials necessary to return the premises to a condition reasonably acceptable to the owner of the premises.

(c) **Covenants and Agreements by JamSports.** JamSports covenants and agrees that, at the time of each Supercross event, JamSports shall have the rights to use

the track facilities and premises upon which the Supercross event produced by JamSports shall be conducted; and, that it shall have the full rights and authority to conduct the Supercross event thereon. JamSports further covenants and agrees to and shall use its reasonable best efforts to: (i) obtain representations and warranties from the venue of the Supercross event that the track facilities and premises are in compliance with the applicable requirements of the Americans with Disabilities Act of 1990, all of the rules and regulations promulgated thereunder and all other applicable federal, state or local statutes, rules, regulations or ordinances; and (ii) obtain agreement from the venue to indemnify AMA Pro Racing, American Motorcyclist Association ("AMA"), AMA Districts, and their respective trustees, directors, officers, representatives, employees, successors and assigns relative to any claim that the venue is not in compliance with any such federal, state or local law or regulation. In the event JamSports is unable to obtain such representation and warranty and agreement for indemnification from the venue, ~~JamSports will advise AMA Pro Racing of same and will proceed with such venue only upon the prior written consent of AMA Pro Racing; provided, however, that if JamSports proceeds with the venue without obtaining such representation and warranty and agreement for indemnification from the venue and without such prior written consent of AMA Pro Racing,~~ JamSports shall indemnify AMA Pro Racing, AMA, AMA Districts, and their respective trustees, directors, officers, representatives, employees, successors and assigns for any claims that the venue is not in compliance with any federal, state or local law or regulation. If a venue is removed from the Supercross schedule because JamSports is unable to obtain such representations and warranties and indemnification from the venue, the market in which the venue is located shall be counted for purposes of measuring the ~~Performance Standard~~ **performance standard (and Renewal Condition)** relating to market size.

(d) **Disclaimer of Liability**.  JamSports shall be responsible solely for the negligence, gross negligence or willful misconduct of JamSports and expressly disclaims any and all liability for the negligence of any other person, party, entity or organization. AMA Pro Racing shall be responsible solely for the negligence, gross negligence or willful misconduct of AMA Pro Racing and expressly disclaims any and all liability for the negligence of any other person, party, entity or organization.

(e) **Indemnification**.  Nothing contained in this Section ~~7~~ 6 shall modify the allocation of liability for third party claims as set forth in Section ~~18~~ 16 below.

~~8~~ 7. **Sanctioning Issues**.

(a) **Control Over Sporting Matters**.  AMA Pro Racing shall retain control over and responsibility for all sporting matters at the Supercross events, including, without limitation, enforcement of rules and regulations relating thereto, technical matters, track approval, race format and structure. AMA Pro Racing shall have exclusive control of all on-track activities. JamSports agrees to conform to and comply with all applicable AMA Pro Racing Rules and Regulations, a copy of which is attached hereto as Addendum B, as may be amended from time to time.  Any additions or modifications shall be promptly provided by AMA Pro Racing to JamSports in writing.

(b) <u>Sanctioning Services</u>. AMA Pro Racing shall perform certain services for each Supercross event, which services shall include race control and operations, timing and scoring, technical inspection of equipment, registration of participants, rider medical insurance, track marshals, and all other services more specifically set forth in <u>Addendum C</u> hereto (the "**Sanctioning Services**").

(c) <u>Sanctioning Fee</u>. In consideration of its performance of the Sanctioning Services, AMA Pro Racing shall receive a sanctioning fee per Supercross event in an amount equal to the cost of such Sanctioning Services, including normal and customary charges incurred by AMA Pro Racing in the performance of the Sanctioning Services such as personnel, overhead and administrative services, similar in nature, type and amount of such costs in the past (the "**Sanctioning Fee**"). Such Sanctioning Services shall be provided at cost, and AMA Pro Racing shall provide JamSports with full details regarding the Sanctioning Services and the costs thereof. The initial Sanctioning Fee shall be approximately thirty-one thousand dollars ($31,000.00) per Supercross event. Such Sanctioning Fees shall be paid out as Supercross event expenses. The Sanctioning Fee for each Supercross event during the Term shall be paid to AMA Pro Racing three (3) days prior to the date of each such Supercross event. After the final event of each Supercross Season, any adjustments for the difference between the actual costs of such Sanction Services provided and the Sanctioning Fees paid shall be made at the time of the final settlement for each Supercross Season.

(d) <u>Approval of Series Schedule</u>. AMA Pro Racing shall retain final approval, which approval shall not be unreasonably withheld or delayed, over the Series schedule to ensure appropriate travel patterns, recognition of holidays and similar matters. Upon the signing of this Agreement, AMA Pro Racing and JamSports shall immediately begin discussions regarding the initial schedule for the 2003 Series. The preliminary 2003 Series schedule shall be available no later than ~~January 31~~ **February 28**, 2002 (the "**Target Date**") and shall include at least ten (10) Supercross events (exclusive of the Exception Events). In the event there are delays in meeting the Target Date, the parties agree that JamSports shall not be in default of its obligations under this Agreement with respect thereto so long as such delays are not caused solely by JamSports or by events under the sole control of JamSports.

(e) <u>Publication of Series Schedule</u>. AMA Pro Racing and JamSports shall cooperate with each other to ensure that the Series schedule is published no later than June 30th of the year prior to the Supercross Season for which the schedule is prepared.

9 **8**. <u>Financial Terms</u>.

(a) <u>Event Revenue Share</u>. AMA Pro Racing shall receive the greater of (i) eight percent (8%) of the gross gate receipts (less applicable taxes) of each Supercross event, or (b) thirty percent (30%) of Event Net Income (as defined below) of each Supercross event (in either case, hereinafter referred to as "**Revenue Share**"), and the remainder of the gross gate receipts or Event Net Income, as the case may be, of each Supercross event shall be retained by JamSports. The parties acknowledge and agree that any and all facility fees which are required by the venues to be added to the ticket prices (and are not

paid to either party to this Agreement) shall not be included in the gross gate receipts or Supercross event revenues generated from such Supercross events.

"**Event Net Income**" shall mean gross revenues generated from each Supercross event, minus Event Expenses as set forth in ~~Exhibit 2~~ **Exhibit 1** hereto.

(b) <u>Advance</u>.

(i)     **Timing; Purpose; Amount**. JamSports shall advance to AMA Pro Racing a total of $3,000,000 in three (3) installments of $1,000,000 each on April 15, 2002, May 15, 2002 and June 15, 2002. The advance will be used by AMA Pro Racing as general working capital to invest in the <u>Supercross</u> Series including, but not limited to, expenditures for media, television~~,~~ **and** marketing ~~and other related functions~~(the "**Advance**"). The Advance shall be recouped by JamSports as set forth in <u>Section 9(b)(ii)</u> **8(b)(ii)** below. Within fifteen (15) days of the signing of this Agreement, JamSports shall obtain an irrevocable letter of credit in the amount of Three Million Dollars ($3,000,000) for the benefit of AMA Pro Racing. The Letter of Credit will enable AMA Pro Racing to draw, in accordance with the terms and subject to the conditions therein, One Million Dollars ($1,000,000) on April 15, 2002, One Million Dollars ($1,000,000) on May 15, 2002, and One Million Dollars ($1,000,000) on June 15, 2002 unless payment is made directly from JamSports.

(ii)     **Recoupment by JamSports**. JamSports is entitled to and shall recoup the Advance from AMA Pro Racing's Revenue Share. After JamSports recoups the Advance, JamSports shall commence paying AMA Pro Racing's Revenue Share to AMA Pro Racing. ~~Except as otherwise provided in this Agreement (including, without limitation, in this Section 9(b) and Sections 13 and 19 below), if~~ **If** the full amount of the Advance is not recouped by JamSports during the Term of this Agreement as provided herein, the remainder of the Advance shall not be refundable to JamSports.

(c) **Access to Books and Records**. An authorized representative of AMA Pro Racing shall be given full access to the box office settlement at each Supercross event. All receipts, including, without limitation, Back Gate Sales (as defined below), shall be openly reported for each Supercross event, and an accounting shall be provided by JamSports to AMA Pro Racing for each Supercross event. A tentative accounting of each Supercross event shall be provided to AMA Pro Racing on the last day of each Supercross event, and a final accounting of each Supercross event shall be provided to AMA Pro Racing no later than thirty (30) days after the last day of each such Supercross event. The final settlement between the parties for each Supercross Season shall occur within a reasonable time following the last event of each such Supercross Season. Each party to this Agreement shall have the right to audit the receipts and expenses of the other party with respect to Supercross events promoted by JamSports under this Agreement.

(d) **Payments to Participants**. AMA Pro Racing shall pay to Supercross event participants (i.e., riders and/or teams) amounts predetermined by AMA Pro Racing and

agreed upon by JamSports for participating in the Supercross events ("**Participation Payments**"), which shall include, without limitation championship bonuses (the "**Championship Bonuses**"). The amount of such Participation Payments may be increased annually upon consultation with JamSports; *provided, however*, that any such annual increases greater than ten percent (10%) shall require the prior written consent of JamSports. Participation Payments shall be paid by AMA Pro Racing from broadcasting and marketing revenues and shall be deductible expenses for purposes of determining Marketing Net Income as defined in Section ~~10(a)~~ 9(a) below.

(e) **Event Purses**. JamSports shall pay a total purse of seventy thousand dollars ($70,000.00) per Supercross event (the "**Event Purses**"), which total amount of the Event Purses shall increase by ten thousand dollars ($10,000.00) each year of the Term of this Agreement. Such Event Purses shall be paid out as Supercross Event Expenses.

(f) **Back Gate Sales**. "**Back Gate Sales**" shall mean ticket sales to Supercross event participants and other persons entering the pit area at each Supercross event. "**Excluded Sales**" shall mean such Back Gate Sales to each team rider and two (2) mechanics per team at each Supercross event. Back Gate Sales less the Excluded Sales shall be included in the Supercross event revenues generated from each Supercross event.

~~10~~ 9. **Other Revenue Streams**.

(a) **Series Media and Marketing Rights**. AMA Pro Racing shall retain exclusive ownership of and managerial responsibility over all broadcasting and marketing rights. AMA Pro Racing and JamSports together shall use reasonable best efforts to seek out and negotiate broadcasting (including, without limitation, television, radio and webcasting) and marketing opportunities. Each party, with the knowledge and consent of the other party, shall have the right to approach potential broadcasting and marketing partners; *provided, however*, that AMA Pro Racing shall have the final decision on any such broadcasting and marketing agreements. The Marketing Net Income (as defined below) generated from any such broadcasting and marketing rights shall be split forty percent (40%) to JamSports and sixty percent (60%) to AMA Pro Racing. For purposes of such broadcasting and marketing rights, the parties agree that the title sponsorship of the Series is part of the Supercross Series sponsorship, and all revenue from and expenses of Supercross Series sponsorships shall be included in determining Marketing Net Income.

"**Marketing Net Income**" shall mean gross revenues generated from the sale of Supercross commercial inventory, including (i) television inventory and (ii) sponsorship and marketing agreements (including title sponsors, Series sponsors and any other category of sponsors not yet determined but excluding Event Sponsorships), minus direct costs associated with (i) and (ii) above, including, but not limited to: (iii) television production and distribution costs; (iv) sponsorship implementation (such as materials, labor, transportation and services) necessary to implement any such sponsorship program); (v) normal and customary sales commissions relating to television or sponsorship programs (except that no such commissions shall be paid for Supercross Series sponsorships directly secured by AMA Pro Racing and/or JamSports and/or any of

their respective affiliates or subsidiaries); (vi) Participation Payments; and (vii) other normal and customary charges associated with securing and implementing such marketing and broadcasting rights.

(b) **Sponsorships**. AMA Pro Racing shall have the right to approve the identity of any proposed sponsor, which approval shall not be unreasonably withheld or unreasonably delayed. In addition to any other sponsors, any individual or entity wishing to display any products or advertisements of goods or services at Supercross events or related activities shall be considered a sponsor for purposes of this Section 10(b) 9(b).

(c) **Event Sponsorships**. JamSports shall use reasonable best efforts to seek out and negotiate sponsorships of the Supercross events ("**Event Sponsorships**"). Event sponsors are those sponsors who sponsor fewer than nine (9) Supercross events in the Supercross Season ("**Event Sponsor**"). Event Sponsorship Net Income (as defined below) from such Event Sponsorships shall be split seventy percent (70%) to JamSports and thirty percent (30%) to AMA Pro Racing; *provided, however,* that in no event shall the available advertising space for Event Sponsorships exceed twenty percent (20%) of the total available advertising space in the venue of each Supercross event, except if and to the extent more than twenty percent (20%) of such total available advertising space is available. Event Sponsors will hold a secondary position to any Supercross Series sponsors or title sponsors and shall not adversely impact any Supercross Series sponsor or title sponsor or AMA Pro Racing managed media and marketing inventory.

"**Event Sponsorship Net Income**" shall mean gross revenues generated from Event Sponsorships, minus direct costs associated with securing and implementing the Event Sponsorships, including (i) Event Sponsorship implementation costs (such as labor, transportation and services) necessary to implement any such Event Sponsorship programs; (ii) normal and customary sales commissions relating to television or Event Sponsorship programs (except that no such commissions shall be paid for Event Sponsorships directly secured by AMA Pro Racing and/or JamSports and/or any of their respective affiliates or subsidiaries); and (iii) other normal and customary charges associated with securing and implementing such Event Sponsorships.

(d) **Product Merchandising Revenue**. Product merchandising relating to the Supercross events and the Series shall be managed by JamSports, with AMA Pro Racing having final approval over the product design and manner of such product merchandising, which approval shall not be unreasonably withheld or unreasonably delayed. Product Merchandising Net Income (as defined below) from such product merchandising shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing.

"**Product Merchandising Net Income**" shall mean gross revenues generated from product merchandising, minus direct costs associated with such product merchandising, including (i) cost of goods, including, without limitation, products, design materials, labor, transportation and services, (ii) normal and customary commissions paid to concessionaires, venues, "boot-leg" security and otherwise, and (iii) other normal and customary charges associated with such product merchandising.

(e) **Internet Merchandising and Audio Visual Products and Other Products**. Merchandising and marketing opportunities relating to audio visual products (including, without limitation, DVDs and videos), video games (but only those provided by suppliers engaged after the Effective Date), board games, books, magazines (other than the current AMA Pro Racing magazine(s)) and other event specific products sold through the AMA Pro Racing Supercross website as of the Effective Date, shall be subject to final approval by AMA Pro Racing, which approval shall not be unreasonably withheld or delayed (individually and collectively, the **"AV and Other Products"**). AV and Other Products Net Income (as defined below) from the sale of such AV and Other Products shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing. AV and Other Products Net Income shall not include revenues generated from and expenses associated with the video games provided by suppliers engaged prior to the Effective Date and current AMA Pro Racing magazine(s), as identified (along with the manufacturers and publishers thereof) in <u>Addendum D</u> hereto. Such exception video games (and the respective suppliers thereof) and the AMA Pro Racing magazine(s) (and the publishers thereof) are set forth in <u>Addendum D</u> hereto.

**"AV and Other Products Net Income"** shall mean gross revenues generated from the sale of AV and Other Products, minus normal and customary charges associated with the sale of such AV and Other Products.

~~11~~ **10**. **Grant of Right to Use the Marks**. AMA Pro Racing shall grant to JamSports the non-exclusive limited right to use the trademarks and service marks which AMA Pro Racing now or hereafter owns, and/or now or hereafter has the right to use, in connection with all advertising, publicity, promotions and marketing in the performance of its obligations under this Agreement, including, without limitation, the marks "AMA", "AMA PRO RACING", "AMA SUPERCROSS" and "SUPERCROSS" and variations thereof. AMA Pro Racing shall also grant to JamSports (or, shall use commercially reasonable efforts to secure for JamSports) a limited right to use any other trademarks and service marks, whether or not owned by AMA Pro Racing, which are usual and customary in the promotion and production of AMA Pro Racing sanctioned Supercross events, as deemed reasonably necessary for the performance of JamSports' obligations under this Agreement. JamSports shall grant to AMA Pro Racing the right to use, in connection with all advertising, publicity, promotions and marketing in the performance of its obligations under this Agreement, including, without limitation, the marks "JAMSPORTS AND ENTERTAINMENT", JAMSPORTS and variations thereof. JamSports shall also grant to AMA Pro Racing (or, shall use commercially reasonable to secure for AMA Pro Racing) a limited right to use any other trademarks and service marks, whether or not owned by JamSports, which are usual and customary in the promotion and production of such events, as deemed reasonably necessary for the performance of AMA Pro Racing's obligations under this Agreement. Each party shall be reasonably available to assist the other party in creating advertising, publicity, promotional and marketing materials and for publicity support. AMA Pro Racing and JamSports agree that the parties shall execute a separate sublicensing/cross-licensing agreement before a party may begin using any trademarks or service marks licensed by the other party.

12. **11.** Advertising: Purchaser Information.

(a) **Advertising and Promotion by JamSports**. To the extent that such advertising and promotion is under the control of JamSports, in the advertising and promotion of the Supercross events and related activities, JamSports agrees to the following:

(i) **Media Exposure**. JamSports shall use commercially reasonable efforts to ensure exposure of AMA Pro Racing in all advertising media for the promotion and publicity of the Supercross events and related activities, including, without limitation, print, radio, television, internet and at the venue and to prominently feature the AMA Pro Racing brand in all such advertising, in accordance with Section 12(a)(iii) **11(a)(iii)** below.

(ii) **Featured Host**. AMA Pro Racing shall be the featured host of all promotional events in connection with the Series and related activities to the general public, manufacturers, teams, sponsors and media.

(iii) **Display of AMA Pro Racing Brand**. The AMA Pro Racing brand shall be prominently displayed (in size at least equal to that of JamSports) in all media for each event of the entire Series and everything relating thereto, including, without limitation, displaying the AMA Pro Racing name on all tickets and press releases.

(iv) **Display Space for AMA**. In each venue, AMA shall be provided with approximately a 20 ft. x 20 ft. display space to be used by AMA for soliciting AMA memberships.

(b) **Advertising and Promotion by AMA Pro Racing**. To the extent such advertising and promotion is under the control of AMA Pro Racing, in the advertising and promotion of the Supercross events and related activities, AMA Pro Racing agrees to provide JamSports with advertising and promotion rights which are reciprocal to those set forth in Section 12(a) **11(a)** above.

(c) **Purchaser Information**. Provided that such information is available to JamSports and provided that JamSports has the right to do so, JamSports shall use reasonable best efforts to provide AMA Pro Racing with purchaser information, including, but not limited to, names, addresses, telephone numbers and email addresses of those individuals or entities purchasing tickets to Supercross events.

13. Revised Marketing Plan. Unless there has been Adequate Participation by the motorcycle manufacturers and Supercross riders in at least one (1) of the first four (4) Supercross events of the 2003 Supercross Season, the parties agree that JamSports, in its sole discretion, may either enact the Revised Marketing Plan (as defined below) or continue under the remaining terms of this Agreement. If at any time it becomes apparent to the parties that there may not be such Adequate Participation as provided herein, the parties may begin preliminary discussions regarding the implementation of such Revised Marketing Plan.

~~The Revised Marketing Plan shall mean the default development plan agreed to by the parties for the Supercross events as set forth in this Section 13 (the "Revised Marketing Plan"). Such Revised Marketing Plan will reexamine markets, venues, the marketing plan for Supercross events, participants and television, and the rules for competition and equipment homologation. Under the Revised Marketing Plan, the Supercross events may be run in conjunction with other AMA Pro Racing sanctioned supercross, arenacross or motocross type events in a manner that maintains economic viability and perpetuates the AMA brand of motorcycle racing.~~

~~Under the Revised Marketing Plan:~~

~~(i) JamSports shall conduct (in addition to the four (4) 2003 Supercross events previously staged) a minimum of six (6) and up to sixteen (16) additional Supercross events during the 2003 Supercross Season and no less than ten (10) and up to twenty (20) Supercross events during each of the 2004 and 2005 Supercross Seasons.~~

~~(ii) AMA Pro Racing agrees that the Supercross schedule may include all sizes of markets and venues on the Supercross schedule.~~

~~(iii) This Agreement shall terminate upon conclusion of the final event of the 2005 Supercross Season unless prior to the conclusion of the 2004 Supercross Season JamSports has given written notice to AMA Pro Racing of its intent to continue under the Revised Marketing Plan. If JamSports elects to continue under the Revised Marketing Plan: (A) it shall do so on economic terms consistent with those set forth in Section 9 above; (B) the parties shall mutually agree upon revised Performance Standards (the "Revised Performance Standards") which shall apply for purposes of renewal and extension of the Term under Section 2 above; and (C) such Revised Performance Standards shall apply to the Supercross Seasons of 2005 and thereafter.~~

~~(iv) AMA Pro Racing's Revenue Share under Section 9(a) shall be eliminated.~~

~~(v) AMA Pro Racing's Sanctioning Fee shall be reduced to the greater of the actual direct cost of providing the Sanctioning Services or $20,000.~~

~~(vi) Marketing Net Income shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing.~~

~~(vii) Entry fees for each Supercross event shall be split fifty percent (50%) to each of JamSports and AMA Pro Racing.~~

~~(viii) If JamSports elects to enact the Revised Marketing Plan pursuant to this Section 13(a), JamSports shall notify AMA Pro Racing in writing that it is enacting the Revised Marketing Plan. Within forty (40) days of delivery of such notification to AMA Pro Racing, Pro Racing shall return fifty percent (50%) of the Advance (i.e., $1,500,000) to JamSports.~~

~~(ix) If the Event Net Income from the Supercross events promoted and produced by JamSports during the 2003 and 2004 Supercross Seasons is equal to or less than Zero Dollars ($0) for each of the 2003 and 2004 Supercross Seasons, then JamSports shall have the right to terminate this Agreement, and the remaining fifty percent (50%) of the Advance (less any amounts recouped by JamSports as of such date pursuant to Section 9(b)(ii) above and any~~

~~reasonable direct expenses incurred by AMA Pro Racing to undertake its broadcast and marketing obligations under this Agreement) shall be refunded to JamSports within forty (40) days of delivery of written notice by JamSports to AMA Pro Racing of such results.~~

~~14.~~ **12. Publicity**.    Neither party hereto shall issue any press releases or other announcements regarding this Agreement or the transaction contemplated hereby unless such release or announcement is first approved by the other party or is required by law, in which case such party shall promptly notify the other party of such requirement.

~~15~~ **13. No Assignment; Successors and Assigns**.  This Agreement shall not be assigned (whether by merger, acquisition, operation of law or otherwise) by AMA Pro Racing or JamSports without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, nor shall the rights, duties or obligations granted under this Agreement in whole or in part be delegated (whether by merger, acquisition, operation of law or otherwise) by either party without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed (any such assignment or delegation an "**Assignment**"). Notwithstanding anything herein to the contrary, no such consent shall be required in the event of an Assignment:  (a) by JamSports to any of its subsidiaries or affiliates, *provided* that such subsidiary or affiliate is not a current or prospective direct competitor of AMA Pro Racing or any affiliate or subsidiary or representative thereof (each an "**AMA Pro Racing Competitor**"); and/or (b) by AMA Pro Racing to any of its subsidiaries or affiliates, *provided* that such subsidiary or affiliate is not a JamSports Competitor. Each party hereby acknowledges and agrees that it shall be deemed reasonable for a party to withhold consent to any Assignment to any JamSports Competitor (as defined in <u>Section ~~19(a)~~ **18(b)(ii)**</u> below) or AMA Pro Racing Competitor, as the case may be.  Subject to the limitations set forth in this <u>Section ~~15~~ **13**</u>, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns.

~~16~~ **14. Independent Contractors**.  It is expressly understood and agreed that the parties are independent contractors and that this Agreement is not intended and shall not be construed to create a partnership, joint venture, principal agent relationship, or any other similar relationship between AMA Pro Racing and JamSports.  Unless specifically provided in this Agreement, neither party is authorized to contract or otherwise make commitments on behalf of the other party, or to otherwise act as an agent or representative of the other party for any reason or purpose.

~~17.~~ **15. Insurance**.

(a) **By JamSports**.  JamSports agrees to acquire insurance of the types and amounts as are commercially reasonable in consideration of its obligations and the activities contemplated under this Agreement, including, without limitation, workers' compensation for its employees and comprehensive general liability (occurrence form) and umbrella/excess liability insurance coverage for (i) premises and operations liability, (ii) broad form property damage, (iii) contractual liability for liability assumed under this Agreement and other contract documents, (iv) personal injury, and (v) products and completed operations liability, with a minimum combined single limit of Two Million ($2,000,000) per occurrence and in the aggregate, or the amount required by the venue,

whichever is greater, on account of any accident, event, or occurrence in or about the facilities of the Supercross events resulting in bodily injury, personal injury, death or property damage. Each such comprehensive general liability policy shall name AMA, AMA Pro Racing, and AMA Districts, and their respective trustees, directors, officers, representatives and employees and successors and assigns as additional insureds. At least ten (10) days prior to any Supercross event, JamSports shall deliver (or cause to be delivered) to AMA Pro Racing a certificate of insurance evidencing such coverage. Each such insurance policy shall be with an insurer having a minimum financial rating of A-VII, in a form reasonably acceptable to AMA Pro Racing and shall provide that it will not be subject to cancellation, termination or change except after at least thirty (30) days' prior written notice to AMA Pro Racing. The policies shall contain a waiver of subrogation clause by the insurer and shall provide that JamSports shall have no liability whatsoever for the negligence, gross negligence or willful misconduct of AMA Pro Racing. JamSports' cost of insurance premiums for such liability coverage for the Supercross events shall be paid out as Supercross event expenses; *provided, however,* that, if JamSports fails to comply with such requirements, AMA Pro Racing may obtain such insurance and keep the same in effect, and the premiums paid by AMA Pro Racing for such policies shall be immediately due and payable by JamSports, at the sole expense of JamSports.

(b) **By AMA Pro Racing**. AMA Pro Racing agrees to acquire insurance of the types and amounts as are commercially reasonable in consideration of its obligations and the activities contemplated under this Agreement, including, without limitation, workers' compensation for its employees and comprehensive liability coverage relating to AMA Pro Racing's obligations under this Agreement. Each such comprehensive liability policy shall name JamSports and its subsidiaries and affiliates and their respective directors, officers, shareholders, members, managers and employees and successors and assigns as additional named insureds. Within ten (10) days of such a request from JamSports, AMA Pro Racing shall deliver (or have delivered) to JamSports a certificate evidencing such coverage. Each such insurance policy shall be with a reputable insurer (i.e., having a minimum financial rating of A-VII), in a form reasonably acceptable to JamSports and shall provide that it will not be subject to cancellation, termination or change except after at least thirty (30) days' prior written notice to JamSports. The policies shall contain a waiver of subrogation clause by the insurer and shall provide that AMA Pro Racing shall have no liability whatsoever for the negligence, gross negligence or willful misconduct of JamSports. The costs of insurance premiums for such insurance coverage provided by AMA Pro Racing shall not be paid out as Supercross event expenses but shall be included in the Sanctioning Fees paid to AMA Pro Racing. If AMA Pro Racing fails to comply with such requirements, JamSports may obtain such insurance and keep the same in effect, and the premiums paid by JamSports for such policies shall be immediately due and payable by AMA Pro Racing, at the sole expense of AMA Pro Racing.

18. **16. Indemnity**.

(a) **By JamSports**. JamSports agrees to indemnify, defend and save harmless the AMA, AMA Pro Racing and their respective trustees, directors, officers, shareholders,

members, managers, representatives and employees and successors and assigns (the "**AMA Indemnified Parties**") from any and all liability, loss, cost, reasonable attorneys' fees and costs, or damage on account of any injury, death, or damage to any person or property arising from, or in any way resulting solely from JamSports' negligence, gross negligence or willful misconduct or breach of any of the terms of this Agreement. Nothing contained herein shall release or relieve AMA or AMA Pro Racing or their respective affiliates and subsidiaries from liability for claims arising from or attributable solely to the negligence, gross negligence or willful misconduct of any of the AMA Indemnified Parties.

(b) **By AMA Pro Racing**. AMA Pro Racing agrees to indemnify, defend and save harmless JamSports and its affiliates and subsidiaries and their respective directors, officers, shareholders, members, managers, representatives and employees and successors and assigns (the "**JamSports Indemnified Parties**") from any and all liability, loss, cost, reasonable attorneys' fees and costs, or damage on account of any injury, death or damage to any person or property arising from, or in any way resulting solely from AMA Pro Racing's negligence, gross negligence or willful misconduct or breach of any of the terms of this Agreement. Nothing contained herein shall release or relieve JamSports or its affiliates and subsidiaries from liability for claims arising from or attributable solely to the negligence, gross negligence or willful misconduct of any of the JamSports Indemnified Parties.

## ~~19~~ 17. **Remedies; Force Majeure**.

(a) **Specific Performance**.

(i) ~~By AMA Pro Racing.~~ JamSports acknowledges and agrees that AMA Pro Racing shall suffer irreparable harm and money damages are an inadequate remedy if JamSports breaches this Agreement by failing to produce and promote the required minimum number of Supercross Events under ~~either~~ Section 3 ~~or under Section 13 (if the Revised Marketing Plan has been enacted), as the case may be.~~ Section 3 **and** AMA Pro Racing shall be entitled to specific performance by JamSports under this Agreement during the Term as a remedy for such breach.

~~(ii) By JamSports. AMA Pro Racing acknowledges and agrees that JamSports shall suffer irreparable harm and money damages are an inadequate remedy if AMA Pro Racing breaches this Agreement by failing to use commercially reasonable efforts to encourage and solicit Adequate Participation. JamSports shall be entitled to specific performance by AMA Pro Racing under this Agreement during the Term as a remedy for such breach. The failure to use commercially reasonable efforts to encourage and solicit Adequate Participation shall include, without limitation, any discussions or agreements by AMA Pro Racing with a current or prospective direct competitor of JamSports or any affiliate or subsidiary or representative thereof or any promoter that would replace JamSports (each a "JamSports Competitor") regarding marketing, promoting and/or presenting the AMA Supercross Series or any Supercross events in North America during~~

~~the Term of this Agreement, except as expressly authorized under Section 20(b)(ii) below, and AMA Pro Racing shall be deemed to have failed to use commercially reasonable efforts to encourage and solicit Adequate Participation if AMA Pro Racing breaches its obligations under Section 20(b)(ii) below.~~

(b) **Arbitration**. In the event of a dispute or alleged breach of this Agreement for which the parties are not seeking recission, specific performance, temporary restraining orders or injunctive relief, the parties agree to binding arbitration to resolve any dispute arising out of or relating to this Agreement or any related agreements or the parties' relationship hereunder. In the event of a dispute or alleged breach of this Agreement, JamSports or AMA Pro Racing shall send a written notice to the other party identifying the dispute or alleged breach and requesting that the dispute be resolved or the breach be cured, as the case may be. If such dispute or breach is not resolved within twenty (20) days following the receipt of the written notice (or if the breach cannot be cured within such twenty (20) day period, and the breaching party failed to take immediate, reasonable efforts to cure such breach), the party identifying the dispute or alleging the breach, as the case may be, may give written notice to the other party that binding arbitration will be used to resolve the issue. Within fifteen (15) days of notice of receipt of the request for binding arbitration, JamSports and AMA Pro Racing shall each select an arbitrator. The arbitrators selected by the parties shall select a third arbitrator who shall serve as chairman of the arbitration board. If either party fails to select an arbitrator within such fifteen (15) day period, then the arbitrator selected by the other party shall serve as the sole arbitrator, in which case references herein to the arbitration board shall mean such arbitrator. Each party shall initially pay for all of the costs and expenses of the arbitration for the arbitrator that it has selected, and they shall equally bear the costs and expenses of the chairperson of the arbitration board. The rules of the American Arbitration Association shall apply, as may be modified in this <u>Section ~~19~~ 17</u>, and the arbitrators shall be guided by the Federal Rules of Evidence, but shall not be strictly bound to follow such rules. Service of any process and notices in the course of such arbitration pursuant to <u>Section ~~25~~ 23</u> below shall be valid and sufficient and the parties irrevocably submit to the jurisdiction of such arbitration and to any award thereunder. The arbitrators may hold a hearing or meeting at any time and place mutually agreeable to the arbitrators, taking into account the availability of the parties. Arbitration awards shall be final and binding upon the parties and shall be enforceable by any court having jurisdiction over the party or parties against which the award was rendered, and shall be limited to remedies otherwise available in court. The arbitration board shall instruct the non-prevailing party to pay all costs of the proceedings incurred by the prevailing party, including, without limitation, the fees and expenses of the arbitrators and reasonable attorneys' fees and costs. If the arbitration board determines there is not a prevailing party or that one party prevailed in certain aspects or matters, the arbitration board may award costs, fees and expenses as the arbitration panel deems appropriate. In the event of a breach by AMA Pro Racing under <u>Section ~~4 or Section 20(b)(ii)~~ 18(b)(ii)</u> or any other breach under this Agreement which prevents JamSports from performing this Agreement, in addition to all other rights and remedies available to JamSports, JamSports' damages shall include, without limitation, full and complete return of the Advance, reimbursement of all costs and expenses incurred by JamSports for its performance under this Agreement, lost

profits over the entire Term of this Agreement, and all costs and expenses to enforce the Agreement, including, without limitation, reasonable attorneys' fees and expenses.

(c) **Force Majeure**. Each party shall be excused from performance under this Agreement and shall have no liability to the other party for any period it is prevented from performing any of its obligations hereunder, in whole or in part, as a result of delays caused by the other party or by an act of God, terrorist, civil disturbance, court order, third party performance or non-performance or other cause beyond such party's reasonable control.

## ~~20~~ 18. **Restrictive Covenants**.

(a) **Confidential Information and Non-Disclosure**. Each of JamSports and AMA Pro Racing hereby acknowledges and agrees that, as a party to this Agreement, each shall have access to and receive Confidential Information of the other party from time to time, and further acknowledges and agrees that Confidential Information of the Disclosing Party (as defined below) constitutes trade secrets of such Disclosing Party. The Receiving Party (as defined below) covenants and agrees to keep confidential the Confidential Information of the Disclosing Party and further covenants and agrees not to disclose or otherwise convey any portion of such Confidential Information to other persons or entities except to its employees, attorneys, accountants, financial advisors, affiliates, subsidiaries, representatives and advisors who need to know such Confidential Information for the purpose of evaluating or performing under this Agreement (it being understood and agreed by the Receiving Party that such persons shall be informed by the Receiving Party of the confidential nature of such Confidential Information and shall be instructed not to divulge or use for its own benefit or the benefit of others (except as expressly permitted in this Agreement) such Confidential Information. With respect to each item of Confidential Information, this covenant of confidentiality shall exist during the term of this Agreement and (i) for a period of three (3) years after the expiration or the termination, for any reason whatsoever, of the term of this Agreement, if such item does not constitute or ceases to be a trade secret, or (ii) indefinitely, if such item of Confidential Information constitutes a trade secret, until such item of Confidential Information ceases to be a trade secret but in no event less than three (3) years after the expiration or the termination, for any reason whatsoever, of the term of this Agreement.

(i) **Definition**. The Term "**Confidential Information**" includes all confidential, proprietary or nonpublic information and trade secrets of a party and/or its subsidiaries and affiliates (collectively, the "**Disclosing Party**") that the other party and/or its subsidiaries and affiliates receives or gains access to (collectively, the "**Receiving Party**"), including, but not limited to, the terms of this Agreement, and in particular, its financial terms, and with respect to the Disclosing Party, its business, marketing and financial plans and other information about its business and affairs (including, without limitation, historical financial statements, financial projections and budgets, historical and projected sales). Confidential Information of each party shall also include, without limitation, information pertaining to its: brand management; participant relations; vendor and venue relations; strategic plans of the business and for the Series;

goals and objectives of the business and the Series; general and specific plans for expansion and development of the business and the Series; techniques; methods; know-how; and, any other confidential and proprietary information and trade secrets with respect to the Series and its respective business.

(ii)     **Exceptions**.     Notwithstanding     the     foregoing,     Confidential Information does not include information which: (i) was or becomes generally available to the public other than as a result of a disclosure by the Receiving Party or its agents or representatives to one or more unauthorized parties; (ii) was known by the Receiving Party prior to the Effective Date; (iii) becomes available to the Receiving Party on a non-confidential basis from an independent source without breach of any confidentiality obligations; (iv) is developed independently by the Receiving Party without use of the Confidential Information or breach of this Agreement or any other confidentiality obligations; (v) or which the Receiving Party is required to disclose by or to any court, governmental or quasi-governmental agency, regulatory body, authority or instrumentality of competent jurisdiction provided that the Receiving Party shall, prior to any such disclosure, promptly notify the Disclosing Party of such requirement in order that such Disclosing Party may seek an appropriate protective order, and such Receiving Party shall cooperate with such Disclosing Party in seeking such an order at the Disclosing Party's expense.

(b) **Non-Competition**.

(i)     **JamSports**. During the Term of this Agreement, JamSports shall not compete with AMA Pro Racing in North America in the area of motorcycle sports events, and for a period of two (2) years thereafter, JamSports shall not compete with AMA Pro Racing in North America in the area of Supercross motorcycle events; *provided, however,* that such restriction shall not apply in the event this Agreement is terminated due to a breach of this Agreement by AMA Pro Racing *provided* that such breach by AMA Pro Racing is not the result of a breach of this Agreement by JamSports.

(ii)     **AMA Pro Racing**. During the Term of this Agreement, AMA Pro Racing shall not solicit, engage or enter into any discussions or agreements with any ~~JamSports  Competitor~~ **current, or prospective direct competitor of JamSports or any affiliate or subsidiary or representative thereof or any promoter that would replace JamSports (each a "JamSports Competitor")** for the marketing, promotion and/or presentation of Supercross motorcycle sports events in North America; *provided, however*, that such restriction shall not apply with respect to such discussions relating to an agreement which would be effective after the expiration ~~or termination~~ of the Term of this Agreement.

(c) **Further Acknowledgements**. JamSports and AMA Pro Racing each hereby further acknowledges and agrees that: (i) the restrictive covenants are reasonable in scope and time; (ii) are necessary for the protection of the business and good will of the parties; (iii) the non-breaching party shall suffer irreparable harm in the event of a breach

of such restrictive covenants; (iv) it is impossible to measure in money the damages which will accrue to the non-breaching party by reason of a party's failure to perform its obligations under this Agreement; and (v) the non-breaching party shall be entitled to all remedies available to it by law or at equity.

(d) **Remedies**.  In the event of a party's breach of this Section ~~20~~ **18**, the non-breaching party shall be entitled to seek any recovery allowed at law and in equity, including, without limitation, to obtain injunctive relief against the breaching party, without bond but upon due notice, to prevent any anticipatory or continuing breach of this Section ~~20~~ **17**, and to secure its enforcement.  Obtainment of any such injunction shall not be deemed an election of remedies or a waiver of any right to assert any other remedies the non-breaching party may have at law or in equity.

~~21~~ **19**.  **Authority to Contract**.

(a) **AMA Pro Racing**.  By executing this Agreement, AMA Pro Racing represents and warrants that it has the full and unrestricted authority to enter into and abide by the terms of this Agreement, including granting the respective rights to JamSports as provided herein.

(b) **JamSports**.  By executing this Agreement, JamSports represents and warrants that it has the full and unrestricted authority to enter into and abide by the terms of this Agreement, including granting the respective rights to AMA Pro Racing as provided herein.

~~22~~ **20**.  **Authority to Sign**.  Each party to this Agreement certifies that the individual executing this Agreement is duly authorized to do so on behalf of said party. Upon request by any party, the parties shall deliver an executed original of this Agreement.

~~23~~. **21.** **Request to Execute**.  Each party to this Agreement, upon the request of any other party to this Agreement, shall:  execute, acknowledge and deliver such further documents or instruments and perform such further acts as may be necessary, desirable or proper to carry out more effectively the purpose of this Agreement.

~~24~~ **22**.  **Notice Requirements**. All notices, requests, demands and other communications shall be in writing and shall be deemed to have been given if personally delivered, sent by facsimile transmission (with delivery confirmation) or mailed by certified mail, return receipt requested, to the addresses set forth below and directed to the attention of those persons identified, or to such other addresses and persons as a party may designate by notice thereof to the other party.  All notices personally delivered shall be effective upon delivery; all notices properly sent by facsimile transmission shall be effective one (1) business day after the date of transmission; and all notices mailed by certified mail, return receipt requested, shall be effective three (3) business days after the date of mailing.

If to JamSports:                    JamSports and Entertainment, LLC
                                    207 West Goethe Street
                                    Chicago, Illinois 60610

Attn: Mr. Jerry Mickelson, Manager
Facsimile: 312/266-9568

With a copy to:

Piper Marbury Rudnick & Wolfe
203 North LaSalle Street, Ste. 1800
Chicago, Illinois 60601
Attention: William A. Rudnick, Esq.
Facsimile: 312/630-5328

If to AMA Pro Racing:

AMA Pro Racing
13515 Yarmouth Drive
Pickerington, Ohio 43147
Attention: Mr. Scott Hollingsworth, CEO
Facsimile: 614/856-1924

With a copy to:

Kevin L. Shoemaker, Esq.
Shoemaker, Winkler, Howarth & Taylor, LLP
471 E. Broad Street, Ste. 2001
Columbus, Ohio 43215
Facsimile: 614/280-9675

~~25~~ **23. Governing Law; Jurisdiction.** This Agreement shall be governed by the laws of the State of Illinois, without giving effect to that State's laws on conflict of laws. AMA Pro Racing and JamSports each irrevocably submits to jurisdiction and venue over any matter arising from or related to this Agreement in the courts located in Cook County, Chicago, Illinois or Franklin County, Columbus, Ohio. Service of process may be made upon a party by mailing a copy thereof to such party by certified or registered mail, at its address used for the giving of notices under this Agreement

~~26~~ **24. Standard of Conduct.** Each party hereto hereby covenants to (a) operate its business in accordance with all applicable laws, (b) conduct its business in accordance with reputable business practices, (c) act in good faith in its dealings with the other party hereto in accordance with the terms of this Agreement, and (d) maintain its books and records in accordance with generally accepted accounting principles or income tax accounting principles, in either case consistently applied.

~~27~~ **25. Waiver.** The terms, covenants, representations, warranties and conditions of this Agreement may be waived only by a written instrument executed by the party waiving compliance. The failure of any party at any time to require performance of any provisions of this Agreement shall, in no manner, affect the right at a later date to enforce the same. No waiver by any party of any condition, or breach of any provision, term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise, in any one or more instances shall be deemed to be or construed as a further or continuing waiver of any such condition or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

~~28.~~ **26. Severability**. In the event that any provision or portion of any provision of this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement.

~~29~~ **27. Survival**. Notwithstanding any termination or expiration of this Agreement, there shall remain in full force and effect those provisions of this Agreement (including, but not limited to, the confidentiality, non-compete and indemnification provisions) which expressly or by their nature are intended to survive such termination or expiration.

~~30~~ **28. Costs**. Each party hereto shall be responsible for and shall bear all of its own costs and expenses incurred at any time in connection with pursuing or consummating the transaction contemplated hereby. In the event a party to this Agreement hereto commences any action or proceeding (whether through arbitration, litigation or otherwise) to enforce or interpret the terms of this Agreement, the prevailing party in any such action or proceeding shall be entitled to reimbursement of its costs and expenses, including, without limitation, reasonable attorneys' fees and expenses resulting therefrom, which fees and costs shall be in addition to any other relief awarded by the court or arbitrator.

~~31~~ **29. Entire Agreement**. This Agreement, together with the Exhibits and Addenda hereto, and any other documents, instruments and agreements entered into in connection herewith, contain the entire agreement between the parties relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated. This Agreement (including the Exhibits and Addenda) may not be amended, revised or terminated orally, but only by a written instrument executed by both parties. Any alleged amendment, revision or termination, which is not so documented, shall not be effective as to any party.

~~32.~~ **30. Counterparts**. This Agreement may be executed in counterparts and by facsimile, each of which shall be deemed to be an original and all of which, when taken together, shall be deemed to constitute one and the same agreement.

~~33~~ **31. Rights and Remedies Cumulative**. All rights and remedies of the parties under this Agreement are cumulative, and no right or remedy of a party shall be deemed to be the exclusive right or remedy of such party. The exercise of any remedy shall not be deemed an election of remedies or a waiver of any right to assert any other remedies a party may have at law or in equity.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the *Effective Date.*

JAMSPORTS AND ENTERTAINMENT, LLC,
a Delaware limited liability company


By: _____

Jerry Mickelson, Manager


PARADAMA PRODUCTIONS, INC. D/B/A
AMA PRO RACING, an Ohio corporation


By: _____

Scott Hollingsworth, Chief Executive Officer

## ADDENDUM A

## PERFORMANCE STANDARDS

The following ~~Performance Standards~~ **performance standards** shall be used for purposes of ~~this Agreement.~~ **the Renewal Conditions referred to in Section 2(a) (the "Renewal Conditions").**

(a) **Renewal Conditions.**

(1) **Attendance.** During the Term of this Agreement, JamSports shall compute the actual paid attendance figures per Supercross event for each Supercross Season ("Event Attendance Figure"). The average of any three (3) Event Attendance Figures of the preceding five (5) Supercross Seasons ("Season Average") shall equal or exceed the base attendance figure per Supercross event per Supercross Season as set forth below:

(A) 40,000 if there was no competing Supercross series in the same or similar markets during the three (3) Supercross Seasons that produced the Season Average;

(B) 36,666 if there was a competing Supercross series competing in the same or similar markets during one (1) of the Supercross Seasons that produced the Season Average;

(C) 33,333 if there was a competing Supercross series competing in the same or similar markets during two (2) of the Supercross Seasons that produced the Season Average; or

(D) 30,000 if there was a competing Supercross series competing in the same or similar markets during the three (3) Supercross Seasons that produced the Season Average.

(2) **Markets and Venues.** Supercross events shall be run annually in markets and venues consistent with the size, type and quality of the markets and venues in which Supercross events are presently run. JamSports shall be deemed to satisfy this Renewal Condition if Supercross events are promoted and produced by JamSports in ten (10) of the thirty-five (35) largest markets in North America. **For purposes of this Agreement, references to "markets" shall mean the market areas as determined by the Standard Metropolitan Statistical Areas (as defined by the U. S. Census Bureau) (the "SMSA"), and the "largest markets" shall be those determined by the SMSA.**

(3) **Active Promotion of Events.** JamSports shall ensure that for each Supercross event during each Supercross Season sufficient funds are spent on promotion of the Supercross events, including, without limitation, radio, television and print advertising, and production to ensure that there is adequate market advertising penetration of appropriate scope and breadth for the specific market and venue.

CHGO1:30073623.v20

(4)    **Quality**.  JamSports shall produce Supercross events of equal quality to those presently being run in the Supercross Series.  JamSports shall ensure the timely and smooth operation of all Supercross events.

*DRAFT 2/08/02*

# ADDENDUM B

## AMA PRO RACING RULES AND REGULATIONS

*(See attached)*

*DRAFT 2/08/02*

## ADDENDUM C

## SUPERCROSS SANCTIONING SERVICES

### Fixed Cost Services

AMA Pro Racing agrees to provide to JamSports the following Sanctioning Services for the Term of the Agreement:

*Race Management Personnel*

1)  A Race Manager who will maintain ultimate control over all race and floor operations, timing and scoring and other matters, including, but not limited to, the following:

   a)  Race track homologation; and
   b)  Managerial oversight of all track marshals and safety personnel.

2)  An Assistance Race Manager to support the Race Manager;

3)  An Observer, reporting to the Race Manager, performing certain race control functions;

4)  Timing and scoring personnel capable of operating transponders for electronic timing and scoring consistent with current service and staffing levels;

5)  Technical inspection personnel and other official personnel; and

6)  Truck driver.

*Technical Services*

1)  Technical equipment and personnel necessary to approve equipment for competition and compliance inspection(s) after competition;

2)  Rulemaking and enforcement for all aspects of competition and management of the appeals process for all competitors;

3)  Homologation services for equipment manufacturers wishing to compete in the Series;

4)  Training of technical and safety personnel; and

CHGO1:30073625.v20

Addendum C - 1

5) A live "feed" from transponders providing real time timing and scoring information for use by competitors, event entertainment (score boards, etc), and for use on the website;

*Operating Equipment*

AMA Pro Racing shall provide all equipment necessary to perform duties required herein, including:

1) Truck and trailer to transport equipment and act as mobile office for registration, tech and other services; and

2) Scales, fuel testing and other equipment required to ensure rules enforcement.

*Administrative Services*

1) Administration of points standings and purse and contingency bonus payouts;

2) Public relations function necessary to support aspects of competition under authority of AMA Pro Racing;

3) Management of rider licensing and credentialing;

4) Management of event entries;

5) Administration of rider medical insurance program;

6) Event registration, including collection, accounting and disbursement of guest passes, contingency sponsor and other "overbuy" revenues on behalf of JamSports; and

7) Administration of substance abuse program.

*Other Services*

1) AMA Pro Racing Agrees to provide services associated with operating the "Jr. Supercross" race program, consistent with current practices, including, registration, practices, scoring and other race operations;

2) Assistance with paddock orientation;

3) Management of paddock parking; and

4) Race day staging and scheduling.

Addendum C - 2

## Variable Cost Services

AMA Pro Racing will provide the Sanctioning Services listed below to JamSports on an annual basis:

1) Participation in the AMA Pro Racing Rider Medical Insurance Program as required for each Sanctioned Event. The terms for such insurance will reflect loss experience under the policy and changes in the cost of insurance generally.

2) Officials necessary to perform customary duties in conjunction with an event (currently approximately 25).

Addendum C - 3

## ADDENDUM D

## VIDEO GAMES AND MAGAZINES

## VIDEO GAMES – SUPPLIERS

EA Sports –

THQ –

Motorsports Simulations, Inc. -

## MAGAZINES – PUBLISHERS

American Motorcyclists -

CHGO1:30073625.v20

Addendum D - 1

# EXHIBIT 3 1

## DIRECT EVENT EXPENSES

Direct event expenses for purposes of determining Event Net Income shall include:

Advertising and Promotion
Box Office Fee
Carpenters
Catering
Clean Up
Communication
Cost of Dirt (including, without limitation, storage and rental)
Credit Card
Doctors/Ambulance
Electricians
Event Purse
Event Staff
Facilities/Trailer
Hospitality
Insurance
Medical and Fire Insurance
Miscellaneous
Plumbers
Plywood
Police
Promotion Tickets and Trade
Reclamation
Sanctioning Fees
Stadium Rental
Stagehands
Teamsters
Ticket Printing
Ticket Sales
Track Design and Construction
Travel
Trucking
Ushers and Ticket Takers
Video

Other normal and customary charges associated with promoting and producing Supercross events.

CHGO1:30073625.v20

Exhibit 1 - 1

*P.    W    AFT 01/08/02-REV*

------------------- COMPARISON OF HEADERS -------------------

-HEADER 1-

~~DRAFT 1/28/02~~

PMRW DRAFT 01/08/02-REV

-HEADER 2-

Header Discontinued

------------------- COMPARISON OF FOOTERS -------------------

-FOOTER 1-

-FOOTER 2-

~~16~~ **12**

-CHGO1: ~~30073625.v17~~ |**30073625.v20**

-FOOTER 3-

-CHGO1: ~~30073625.v17~~ |**30073625.v20**

A

-FOOTER 4-

*P.. W.. AFT 01/08/02-REV*

~ ~. -CHGO1: ~~30073623.v17~~ <u>**30073623.v20**</u>

Addendum A - 1

A

-FOOTER 5-

- ~ ~CHGO1: ~~30073625.v17~~ <u>**30073625.v20**</u>

Addendum B - 1

A.

-FOOTER 6-

Addendum C - 3

~CHGO1: ~~30073625.v17~~ <u>**30073625.v20**</u>

-FOOTER 7-

- - ~CHGO1: ~~30073625.v17~~ <u>**30073625.v20**</u>

Addendum C - 1

A

-FOOTER 8-

Footer Discontinued

-FOOTER 9-

26

~CHGO1:30073625.v11 |1/12/02

3

-FOOTER 10-

~ - - ~ ~CHGO1: ~~30073625.v17~~ | **30073625.v20**

Addendum D - 1

A

-FOOTER 11-

~ - ~CHGO1: ~~30073625.v17~~ **30073625.v20**

Exhibit ~~2~~ **1** - 1

E

#2

JS 44
(Rev. 11/95)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as requ by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the of the Clerk of Court for the purpose of initiating the civil docket (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
TanSports and Entertainment

## DEFENDANTS
American Motorcyclist Association

JUDGE ASPEN

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF *Cook Co.*
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT *Fairfield Co.*
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

04C 2461

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
MAGISTRATE JUDGE KEYS

Segal McCambridge Singer + Mahoney, Ltd
330 N. Wabash #200
Chicago, IL 60611    312-645-7800

DARENS + KRIVDA
471 E. Broad Street #2001
Columbus, OH 43215

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☐ 2 U.S. Government Defendant
☐ 3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties In Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINT AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DE |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **LABOR** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☒ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justi |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

28 U.S.C. § 1332 – Diversity

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):
JUDGE MATTHEW F. KENNELLY    DOCKET NUMBER 02 C 2298

DATE 4-6-04

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

In the Matter of

JamSports and Entertainment, LLC

vs.

American Motorcyclist Association

*FILED-EDA*

06 MAY 9 – MAY 70

Case Number: U.S. DISTRICT COURT

**JUDGE ASPEN**

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

JamSports and Entertainment, LLC

**04C 2461**

MAGISTRATE JUDGE KEYS

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Jeffrey Singer | NAME P. Mark Crane |
| FIRM Segal McCambridge Singer & Mahoney | FIRM Segal McCambridge Singer & Mahoney |
| STREET ADDRESS 330 N. Wabash Avenue – #200 | STREET ADDRESS 330 N. Wabash Avenue – #200 |
| CITY/STATE/ZIP Chicago, IL 60611 | CITY/STATE/ZIP Chicago, IL 60611 |
| TELEPHONE NUMBER 312-645-7800 · FAX NUMBER 312-645-7711 | TELEPHONE NUMBER 312-645-7800 · FAX NUMBER 312-645-7711 |
| E-MAIL ADDRESS jsinger@smsm.com | E-MAIL ADDRESS mcrane@smsm.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 02620510 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06191770 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
|  | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Paul E. Wojcicki | NAME |
| FIRM Segal McCambridge Singer & Mahoney | FIRM |
| STREET ADDRESS 330 N. Wabash Avenue – #200 | STREET ADDRESS |
| CITY/STATE/ZIP Chicago, IL 60611 | CITY/STATE/ZIP |
| TELEPHONE NUMBER 312-645-7800 · FAX NUMBER 312-645-7711 | TELEPHONE NUMBER · FAX NUMBER |
| E-MAIL ADDRESS pwojcicki@smsm.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06202143 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |